## CLARK, ET AL. V. BÁTES, ET AL.

*1. INDIAN COUNTRY:* PURPOSE AND EFFECT OF NON-INTERCOURSE ACT OF 1834. The purpose and effect of the Non-Intercourse Act of 1834, was to declare and proclaim what was then Indian country; country in which the manners, customs and laws of the Indian tribes prevailed, and in which the United States should protect them in all their natural and guaranteed rights, and not to declare or maintain that to be Indian country, which was not in fact in the occupation and under the control of the Indians.

*2.* ———: CEDED: RIGHT OF OCCUPATION. The policy of all branches of the government, from the earliest times, has been to protect all citizens in the occupation of ceded Indian country, and to secure cessions as fast as demanded by the increase of our own population, and when territory has once been solemnly ceded by the Indians, it has never afterwards been considered or treated as Indian country for any purpose.

*3.* ———: EFFECT OF CESSION BY TREATY. Cessions by treaty, duly proclaimed by the President, have always been considered and treated by the people of the United States, as an invitation from the Executive department to all people to come, open and possess the ceded country.

*4.* ———: EFFECT OF TREATY OF 1868. The Non-Intercourse Act of 1834, wherein it fixed and determined the limits of the Indian country, was modified and changed by the treaty with the Dakota nation of Indians, made in 1868, as it had been by various other preceding treaties.

*5. TRESPASS:* UNDER LEGAL PROCESS. The suing out of legal process, and the delivery of the goods to the officer having it, is part of the same transaction, and in the eye of the law, wilfully set on foot and consummated by the party suing out the process, and he is liable to the party against whom the proceedings are instituted for the damages actually sustained.

*6.* ———: ———: DAMAGES: MITIGATION. The rule as to what may be shown in mitigation of actual damages sustained in actions of trespass, should be limited to evidence of actual benefit received by the plaintiff, after the trespass, from the property taken.

*7.* ———: ———: ———: ———. If after the property has been taken in trespass from the owner, an execution against him is levied thereon and the property sold, and a judgment against the owner thereby satisfied, this may be shown in mitigation of damages, and the law will presume the assent of the owner to such application of the property as is for his benefit, to the extent of such benefit.

*8.* ———: ———: ———: ———. Where the verdict is only for actual damages sustained after deducting all benefits derived by the plaintiff from the return of some portion of the goods, it is incompetent to show in mitigation of damages that after the trespass was committed, and before the goods were returned, they

were in the custody of the law, under and by virtue of process, for the purpose of enabling the jury to deduct from the aggregate damages, the damages done the goods while in such custody.

9. *PRACTICE:* FORMS OF PROCEDURE: DAMAGES. While under the old practice a portion of the damages only might have been proved and recovered in an action *vi et armis*, and another portion only in an action of *trespass on the case*, under the Code all may be shown and recovered under the complaint stating the simple facts.

10. ———: ———. All distinctions in old forms having been abolished, all damages may be recovered in one action, that flows from the original trespass, and the original trespasser must respond to the extent of the damages.

## *Appeal from Yankton County District Court.*

THE complaint in this action sets forth, that during the month of February, 1873, the plaintiffs were co-partners, engaged in the mercantile business on James River, in Dakota Territory, near the point where the Northern Pacific Railroad crosses said river. That plaintiffs' stock consisted of a general assortment of merchandise. That on the 23d day of February, 1873, the defendants unlawfully, maliciously and with force and arms entered plaintiffs' place of business, and took and carried away all of the goods therein of the value of six thousand dollars, and converted the same to their own use. The complaint concludes with the usual prayer for judgment.

Defendants in the third count of their answer, allege " that all the country at, and near the point where the Northern Pacific Railroad crosses the James river, was, on the 21st day of February, (1873) and for a long time had been, and still is, Indian country, within the true intent and meaning of the Act of Congress, entitled ' An act to regulate trade and intercourse with the Indian tribes and to preserve peace on the frontier,' approved June 30, 1834.'"

This portion of defendants' answer was, on motion of plaintiffs, stricken out, when they asked and obtained leave to file a separate and amended answer, in which they allege in substance:

1. That at the time of the alleged trespass defendant Bates was a Captain, and defendant Yeckley a Lieutenant in

the U. S. army, (Yeckley subject to the orders of Bates) both on duty at Fort Seward, located near plaintiff's place of business. And that whatever they did was done in obedience to orders from the commanding officer of the department of Dakota, to enforce the provisions of the said Act of Congress, approved June 30, 1834.

2.   That defendant Bates believing that all of said country was then Indian country, and that the plaintiffs had introduced spirituous liquors into said country, and there had the same in store with the stock of goods mentioned in the complaint, he ordered Yeckley with others to search said store, and in case they found spirituous liquors therein, to seize the said stock of goods.   Yeckley with others searched the store, found liquors therein and seized the entire stock of goods.

3.   That immediately thereafter Bates notified the U. S. Attorney for the Territory of Dakota, and such proceedings were thereupon had; that before the commencement of this suit the goods were taken by defendant Moore, Deputy U. S. Marshal, on a warrant of attachment, issued out of the United States District Court upon a libel of information in behalf of the United States and against said property, and afterwards and before the commencement of this suit, all of said goods and property were delivered to the plaintiffs, and by them received and accepted. And further, that the proceedings against said stock of goods were then still pending in said court.

On the trial the defendants asked the court to give to the jury the following instructions, which were refused and defendants excepted:

1.   "If the jury find that defendants seized the goods in question, having probable cause to believe and believing that they had been forfeited to the United States by acts of the plaintiffs, and for the sole purpose of placing them in custody of a court having jurisdiction to declare and enforce such forfeiture, and that the goods were taken from the defendants by a U. S. Marshal upon a warrant issued by a court having such jurisdiction, commanding such Marshal to seize such

goods, the defendants cannot be held liable for any damages to such goods, occurring after the goods were so taken from them."

2. "If the jury finds that the goods in question, were rightfully taken from the defendants, after their seizure, by a U. S. Marshal, upon a warrant of attachment, issued by a court of competent jurisdiction, the defendants have a right to offset the value of the goods, when so taken, against the value of the same goods at the time of their seizure."

3. "If the jury find that either of the defendants, in making the seizure of the goods in question, acted under and in pursuance of the immediate and imperative orders of a superior military officer, and that such orders were executed by such inferior officer without malice, oppression, or fraud, or negligence, such defendant is not liable to plaintiffs for any damages resulting from said seizure."

4. "If the jury finds that the seizure of the goods in question, by the defendants, was preliminary to a judicial proceeding in a court of competent jurisdiction, commenced against said goods for the purpose of having them adjudged forfeited to the United States, for acts of the plaintiffs, and that such goods were, after their seizure by the defendants, rightfully seized by a U. S. Marshal upon a warrant issued by a court of competent jurisdiction, in such proceedings, and that such proceedings are still pending, and undetermined, the defendants cannot be held liable for damages resulting from said seizure."

The court charged the jury as follows, to which defendants excepted:

1. "If you, from the evidence, find that the defendants took the goods from the plaintiffs, as charged in the complaint, then I charge you that the plaintiffs are entitled to a verdict in their favor."

2. "If you find that the plaintiffs are entitled to a verdict, then I charge you that the amount the plaintiffs are entitled to receive from the defendants, is the difference between the value of the goods at Jamestown when taken, and the value of the goods at Fargo when returned to them.

Verdict and judgment for plaintiffs, and defendants appeal.

*O. P. Stearns,* for appellants.

Principal question on this appeal: was the country on the line of the Northern Pacific Railroad, immediately west of the James River in Dakota Territory, on the 21st day of February, 1873, Indian country, within the true intent and meaning of Non-Intercourse Act of June 30, 1834?

Section 1, of that Act provides "That all that part of the United States west of the Mississippi River, and not within the States of Missouri and Louisiana, or the Territory of Arkansas, and also that part of the United States east of the Mississippi River, and not within any state to which the Indian title has not been extinguished, for the purpose of this Act be taken and deemed to be the Indian country. (4 U. S. Stats., 729.) The plaintiffs contend that it was not the intention of Congress to include any country to which the Indian title has been extinguished, within the limits of " the Indian country " as defined by the Act, either east or west of the Mississippi River, that *Indian country and country to which the Indian title has not been extinguished* are synonymous.

The defendants contend that by the Act, all the country then in the United States west of the Mississippi River, not in Missouri, Louisiana, or Arkansas, was made *Indian country* for the purposes of that Act, whether the Indian title has been extinguished or not, that the words *"to which the Indian title has not been extinguished"* have no reference to country west of the Mississippi River.

It is well known that the country claimed and held by the several tribes and bands of Indians in the United States, is generally, if not universally without definite boundaries and that not unfrequently portions of the same territory are claimed and alternately occupied by different tribes or bands of Indians. This was especially true of the vast prairie region lying between the Mississippi River and the Rocky Mountains. At the time of the passage of the Act in question it was inhabited by roving bands of Indians, who hunted wherever

game chanced to be most plenty, and claimed and occupied such regions of country, as for the time being, best suited their convenience. To the government of the United States, little was then known as to much of this region, and still less as to the limits of territory claimed by the several bands of Indians. Under the Act of March 30, 1802, (2 Stat., 139) which provided for a shifting boundary line, such as is contended for by the plaintiffs, from a multiplicity of treaties with the several tribes and bands, it became difficult to ascertain what were the limits of the Indian country, though that Act applied to a timbered country, wherein the Indians are much less migratory in their habits than those who live in prairie regions. We should hardly expect Congress to perpetuate these inconveniences and multiply them ten fold by applying the same principle to the region in question. When a law makes it highly penal to do an act on one side of a line which it is lawful to do on the other side of the line, it certainly is highly important there should be easy means of determining very definitely where such line is.

But the best evidence of the intention of Congress in the premises, is the language used in section 1, of the Act, and whether we give to that language its most plain and obvious meaning, or apply to it the most rigid rules of grammatical construction, it leads to the conclusion contended for by the defendants.

So far as we are aware, there is no reported adjudication of the question under consideration, but the understanding of the framers of the Act of June 30, 1834, was in accordance with our construction of it. The committee which reported the Act to the House, remarked, with reference to the Indian country, as defined by the first section, as follows: " *On the west side of the Mississippi, its limits can only be changed by Legislative Act,*" " on the east side of that river it will continue to embrace only those sections of country not within any State, to which the Indian title shall not be extinguished." (See report of Committee, House of Representatives, No. 474, 1st Session, 23d Cong., 1, 10.) And the present Attorney General of the United States takes the same view of the law

as originally enacted, without deciding what effect subsequent legislation, and the general course of events, has had in restricting its applicability. (See Genl. Orders No. 98, War Dept., Oct. 13, 1873.) Assuming our construction of section 1, of the Act of June 30th, 1834, to be correct, we have next to inquire whether any subsequent legislation, or anything else, has had the effect to render it lawful to have and deal in spirituous liquors at the place in question.

We are not aware of the existence of any statute that in terms exempts any portion of the territory west of the Mississippi, originally defined as Indian country, from the operation of the Act.

Has there been any subsequent legislation that by implication repeals or modifies section 1, of the Act in question, as applied to the *locus in quo*. We will not anticipate the plaintiffs by calling attention to the laws that may be supposed to have had this effect, but will call attention to the well settled principles by which all claims of repeal or modification by implication are to be tested.

One statute is not to be construed as a repeal of another if it be possible to reconcile the two together. (Sedgw Stat. and Const. Law, 127; *Harford v. United States*, 8 Cranch, 109. *Cool v. Smith*, 1 Black, 459.) To create a repeal by implication, there must be a positive repugnancy between the provisions of the new law and those of the old, and even then the old law is repealed by implication only, to the extent of the repugnancy. (*Wood v. United States*, 16 Pet., 342; *Daviess v. Fairbaern*, 3 How, 636; *Harden v. Gordon*, 2 Mass., 540.) Tried by these well settled rules of law, we are not aware of any legislation that by implication repeals or modifies to any extent the section under consideration. It will probably not be contended that the mere organization of a temporary territorial government would *per se* have this effect, or that there is anything in the Act of Congress establishing territorial governments inconsistent with a law excluding spirituous liquors; besides the Act establishing the Territory of Dakota specially reserves to Congress the regulation of all matters pertaining to the Indians. (12 Stat., 289, Sec. 1.) Nor will it

be contended that an Act of a territorial legislature can repeal a law of Congress.

It is probable that the treaty of April 29th, 1868, (15 Stat., 636,) extinguishes all title of the Indians to the lands in question except the right of hunting, reserved in the treaty, but we have shown that this alone does not determine the status of the country under the non-intercourse law.

Secondary question: Assuming the taking of the goods in question by defendants, to have been unlawful, what was the true measure of damages? The value of the goods when taken, less their value when returned to the plaintiffs at Fargo, or less their value when seized by the U. S. Marshal?

General rule of damages for wrongful taking of goods which have been returned to owner, admitted to be, value of goods when taken, less value when so returned.

Where a creditor tortiously takes the goods of his debtor and afterwards causes the same goods to be seized on an attachment or execution in an action brought by himself against the debtor and the goods are sold on such execution, in an action by the debtor against the creditor to recover damages for the original tortious taking, the fact of such seizure may be shown in mitigation of such damages, and the debtor can only recover damages for the original taking and the detention until the seizure on attachment or execution. (*Curtis v. Ward*, 20 Conn., 204.) Some authorities deny the last proposition, solely on the ground that the trespasser cannot, by any mere act of his own, rid himself of any liability originally incured, (*Hanmer v. Wilsey*, 17 Wend., 91,) but where the goods are delivered by the trespasser to an officer holding a writ issued by a court of competent jurisdiction, in a suit against the owner not instituted by the trespasser, nor prosecuted for his benefit, duly authorizing said officer to seize such goods, reason and authority concur in regarding such delivery as the equivalent of a delivery to the owner himself. Goods so taken by an officer are held by him under the law, in trust for the owner, until in pursuance of a judgment of the courts they are returned to the owner or otherwise disposed of. In no event can they be returned to the tres-

passer; in no event can the proceeds of any sale of the goods be applied to his benefit. If the goods be forfeited and condemned for acts of the owner, it is no fault of the trespasser and he cannot be held responsible for it. If the officer fails to take proper care of the goods, he is responsible to the owner and not to the trespasser. So far as the trespasser is concerned, the goods are, to all intents and purposes returned to the owner when they are delivered to the officer. When the trespasser thus delivers the goods, his liability is fixed and determinate; he has no power to increase or diminish it by exercising any control over the goods, nor can it be increased or diminished by the acts or omissions of officers of the law rightfully holding the goods for the owner, and it is believed that no reputable authority can be found directly controverting this doctrine.

The case of *Kaley v. Shed*, 10 Met. 317, is a strong case very nearly in point. The jury were instructed that if defendant intended in good faith to return the goods according to the demand, but before a reasonable time had elapsed, they were attached and taken from the defendant into the custody of the law, the measure of damages would be the injury sustained by the plaintiff by the taking and detention of the goods to the time of the attachment, and that the defendant would not be liable for any portion of the value of the goods, although it might not be shown that the goods ever after went to the use of the plaintiff.

On appeal, held correct, Shaw, C. J., delivering the opinion of the court, and among other things remarking: " the property was in the custody of the law, by legal process, which the defendant could not resist or control. * * * The plaintiff's case assumes that the goods were his property, they were attached as his * * they are laid up in the custody of a responsible officer for his use, to be delivered on demand. In no event could the defendant claim them."

As bearing more or less, directly on the question at issue, we cite: *Kaley v. Shed.* 10 Met., 317; *Higgins v. Whitney*, 24 Wend., 379; *Curtis v. Ward*, 20 Conn., 205; *Prescott v. Wright*,

6 Mass., 20; *Paree v. Benjamin*, 14 Pick., 356; *Squires v. Hollenbeck*, 9 Pick., 551; *Greenleaf Bank v. Leverett*, 17 Pick., 1; *Irish v. Cloyes*, 8 Vt.; *Wehle v. Hawland*, 42 How Pr., 399; *Edson v. Weston*, 7 Cow, 279; *Sherry v. Schuyler*, 2 Hill, 204; *Ball v. Liny*, 48 N. Y., 6.

*J. B. & W. H. Sanborn*, for appellees.

Is section 1, of the Non-Intercourse Act of 1834, 4th U. S. Statutes, 729, to be construed as fixing and determining what country or territory shall, for the purposes of that act, be Indian country, so that neither the course of events, subsequent treaties between the United States and the Indian tribes occupying the same, nor any thing, other than a subsequent act of Congress, can change its condition, so that it will not longer be "Indian country" for the purposes of that act?

The act declared that to be Indian country which was in fact unceded Indian country at the date of its passage. This is general history known to the courts as to all other men. At that time the country from the Red River of the North to the Missouri River, and from the British Possessions to the State of Missouri, with the exceptions of a few small reservations for other Indians, was occupied by the Dakota or Sioux Nation of Indians. By the treaty of April 29th, 1868, (15th Statutes, 636,) this nation ceded all these lands to the United States for ample consideration. (Article II. of said treaty, p. 636.) This cession is absolute and without any reservations. Articles eleven and fourteen of said treaty, so far as they relate to country north of the North Platte, must be construed together and with reference to other parts of the treaty. So construed, the country in these articles referred to is the country east of the summit of the Big Horn, and west of the 104th degree of longitude west from Greenwich. This was the country through which the military road passed that had to be closed, and in which the "military posts" were that had to be abandoned. (See Article sixteen of said treaty.)

All departments and officers of the United States Government have considered and treated the "Indian country" as

extending to and including only such country as Indians occupy and which remained unceded by treaty. Large cities, wherein for many years liquors have been kept and sold by wholesale and retail, in violation of the Federal Statutes, if the appellants, are correct, have grown up in the Indian country of 1834. The knowledge of all men as to the present condition of the country embraced in the Indian country of 1834 is cited in support of this position.

The Act of 1834, wherein it defines and limits the "Indian country," has been superseded and modified by all the treaties since made between the United States and Indian tribes occupying the same, by which portions of such country have been ceded to the United States. Country ceded by the Indians to the United States is no longer Indian country. Treaties may supersede prior acts of Congress. ("The Cherokee Tobacco" case, 11 Wallace, 621; *Foster & Elam v. Neilson*, 2 Peters, 314; 8th Curtis, 121.) The construction claimed by the appellants leads to the greatest absurdity. If in 1835 all the Indians in the Indian country as described in the Act of 1834 had made a treaty ceding all that country, and had thereupon removed from the United States, the country would still have been Indian country and the non-intercourse law in full force. This could not have been for the reasons:

1. That the treaty would have superseded the law, and the country have become a part of the public domain, free and clear from all Indian title.

2. The reason of the law having ceased, the law itself ceased, and the general laws of the United States governing trade and intercourse between citizens would have become applicable to that country as to all other portions of the country.

Congress, by the Act of 1834, had no purpose to and did not make that Indian country which before the passage of said act was not so. Congress simply proclaimed the existing state of facts as to what the Indian country then included. For the time being and until portions of this country were ceded by treaty, voluntarily abandoned or taken from the Indians by conquest, this statute was binding on the courts,

but no longer.  The courts are just as much bound by sub-sequent events and treaties, so far as boundary lines are changed thereby, as they would be by subsequent acts of Congress.  The question of what is Indian country and what is to be treated as Indian country is a question to be deter-mined by the courts with reference to the laws, treaties and facts pertaining thereto  Congress has not the power to de-clare that to be Indian country which is not Indian country, and by such means exclude the citizens of the United States from the possession and occupation thereof, or from carrying on lawful trade and commerce therein under the general laws.

The positions and authorities taken and cited by the ap-pellants upon the rule of damages are in no respect applica-ble to the case at bar.  In this case an officer of the United States Government, authorized to seize the goods and prop-erty of citizens under certain circumstances, without process, and hold them until he notifies a United States Marshal, and until the Marshal appears with process to take and hold the goods (13 U. S. Statutes at Large, 29,) under the misappre-hension that the circumstances authorized such seizure in this case, unlawfully seized and took the goods and property mentioned in the complaint from the plaintiffs, and notified the Marshal, who thereupon procured process and took pos-session of the same goods, and thereafter, finding the seizure by the defendants and himself unlawful, turned all this prop-erty back to the respondents.  In such a case the rule must be that the plaintiff is entitled to recover the difference be-tween the value of the goods when and where taken and the goods when and where returned, against any defendant, against whom an action of trespass can be maintained.  And this principle is sustained by the authorities cited by re-spondent.

In the case of a levy of an attachment or execution without the connivance or aid of the original trespasser, for valid cause to satisfy debt, the law simply does that which the debtor should have done—applies the debtor's property to the pay-ment of his debt; and when the law takes possession of it and applies it to this purpose it may be the same as if the

owner had taken full possession, and any damage done or
happening thereafter may be the same as if it had been done
by the owner or happened when in his possession. But in
this case the original trespasser induced the seizure for the
purpose of having the goods libelled and forfeited when there
was no debt and no liability to forfeiture, otherwise the goods
could not have been returned. The reason why courts will
not allow a party to have his debts paid with his goods and
thus recover the full value of the same in an action of tres-
pass because there was a tortious taking before a legal levy,
is plain; but the reason why courts should not allow a party
whose goods and property have been unlawfully taken from
him by the defendant and detained for a time and then re-
turned to him, to recover the damages he has sustained by
such unlawful taking and detention, is difficult to see. And
it can make no difference in such a case that the goods were
a portion of the time in the custody of the law at the insti-
gation of the original trespasser. To protect the original
trespasser at all, the result must show that such goods were
taken into legal custody without his connivance for valid
cause, and that the owner, his creditors or the country, has
derived some benefit from such legal proceedings. The risks
of all miscarriages are with the original trespasser in any
event. The right of action by the respondents against the
appellants for the entire value of the goods was complete the
moment the goods were unlawfully taken, and their liability
in damages cannot be mitigated or changed by what the law
afterwards attempted to do, and failed to do. The return of
the goods, the disposition of the same for the benefit of the
owner by virtue of legal proceedings, or the confiscation and
appropriation of the same by the law, might be shown in
mitigation of damages. But the burden of proof was on the
defendants, to show a disposition made either with the actual
consent of the respondents, or by such legal seizure and sale
under process as would in law necessarily imply consent.
But no sale under process was claimed. The seizure was
temporary and made at the instigation of appellants, and
damage to the goods under such seizure cannot be shown in
mitigation of damages. There was no error in the instruc-

tion below. (Greenleaf on Evidence, Vol. 2, Redfield's edition, 1868, p. 550, and notes and authorities there cited; Sedgwick on the Measure of Damages, 5th edition, 615, Note 1, and authorities.)

KIDDER, J.—The plaintiffs brought an action of trespass *de bonis asportatis* against the defendant for taking and carrying away a stock of merchandise of the plaintiffs, from their store, which was situated near the Northern Pacific Railroad on the west side of James River. The defendants admitted the taking, and justified upon the grounds that they were commissioned officers in the United States army and on duty at Fort Seward; that liquors constituted a part of said stock taken by them, and had been introduced by the plaintiffs, and that the country where the store and the stock of the defendants were situated, was " *Indian country* " within the meaning of the Non-Intercourse Act of 1834, and the amendments thereof. 4 U. S. Statutes, 729; 13 do., 29, and pleaded other matter in mitigation of damages.

The plaintiffs moved to strike out the matter pleaded in justification on the grounds that it was sham, frivolous and constituted no defense to the plaintiff's action. And the court below granted this motion, and the appellant assigns this ruling of the court as one, and the chief error.

The country between the James and Missouri rivers has from the earliest times been in the occupation and under the control of the Sioux or Dakota Nation of Indians. The more northern portion, including the country where the plaintiff's store was situated, having been occupied by the Yanktonaise band, and the more southern by the Yankton band of that nation, until cessions to the United States were made by the respective bands.

On the 29th day of April, A. D. 1868, the United States concluded a *treaty* with the different bands of the Sioux, including the Yanktonaise band, and ratified and confirmed the same on the 16th day of February, A. D. 1869. 15 U. S. Statutes, 647. By the second article of that treaty, page 636, the Indians, parties thereto, "henceforth * * * * * re-

linquish all claims or right in and to any portion of the United States or territories, except such as is embraced within the limits " in said article described, and except as thereinafter provided.

The portion of the territory embraced within the limits in said article specified, was all between low water mark on the east bank of the Missouri River and the one hundred and fourth meridian west from Greenwich, and the north line of Nebraska and the forty-sixth parallel of north latitude. The exceptions in the cessions referred to in article two are found in articles eleven and sixteen of said treaty. The modification of the general cession of territory in article two made by article eleven is simply a reserved right of the Indians to hunt on any lands north of the North Platte River, which includes the country between the one hundred and fourth meridian on the east and the summit of the Big Horn Mountains on the west, and the North Platte River on the south, and the country occupied by the Crows on the north; and also the right to hunt in Southern Nebraska and Northern Kansas on the Republican Fork of the Smoky Hill River. Article sixteen refers exclusively to the territory above described between the one hundred and fourth meridian and the summit of the Big Horn Mountains. The military posts then established in the territory in this article named were the military posts of Fort Reno, Fort Phil Kearney and Fort C. F. Smith. Indeed it was the establishment of these posts and opening the road to them and by them to the settlements in Montana by the United States, that the Sioux nation complained of most loudly, and to which the attention of both contracting parties was most earnestly directed.

From an examination of the said treaty it appears clear, that all the lands occupied or claimed by any portion of the Sioux or Dakota Nation of Indians who were parties to the treaty, situated east of the Missouri River were therein ceded to the United States. This cession included the lands and territory on which the plaintiff's store was situated, from which the defendants took and carried away the said goods.

And this phase of the case presents the naked question, whether all that part of the United States " west of the Mississippi and not within the States of Missouri, Louisiana or Arkansas " is for the purpose of the Non-Intercourse Act of 1834 and amendments, to be taken and deemed to be Indian country, notwithstanding it may, since the passage of the act, have been voluntarily ceded by the Indians then occupying the same, to the United States. The purpose and effect of the Non-Intercourse Act of 1834, was to declare and proclaim what was then Indian country—country in which the manners, customs and laws of the Indian tribes prevailed, and in which the United States should protect them in all their natural and guaranteed rights. It was not the purpose to declare or maintain that to be Indian country which was not in fact in the occupation and under the control of the Indians. At no time in its history has the United States Government surrendered any portion of its territory over which it had once extended absolute jurisdiction, and which had been occupied by its own citizens. The policy of all branches of the government from the earliest times, has been to protect all citizens in the occupation of ceded Indian country, and to secure cessions as fast as demanded by the increase of our own population, by fair and large compensations paid to the Indians. And when territory has once been solemnly ceded by the Indians to the United States, it has never afterwards, so far as we can learn, been considered or treated as Indian country for any purpose. On the other hand these cessions by treaty, duly proclaimed by the President have always been considered and treated by the people of the United States, as an invitation from the executive department to all people to come, open and possess the ceded country.

In pursuance of a published treaty ceding the country to the United States, the plaintiffs in common with large numbers of our people came into the country between the James and Missouri rivers, and entered upon the ordinary avocations of our citizens.

After the ratification of the treaty of 1868, this country was no longer Indian country. The Non-Intercourse Act of 1834,

wherein it fixed and determined the limits of the Indian country, at that time was modified and changed by the treaty between the United States and the Dakota Nation of Indians made in 1868 as it had been by various other treaties preceding this last; and the country in which the plaintiff's goods were seized, as alleged in the complaint and admitted in the answer, was not and had not been since the ratification of the treaty of 1868, Indian country.

The law as to the Indian country had been modified by a subsequent treaty. The *Cherokee Tobacco case*, 11 Wallace, 621; *Foster and Elam v. Neilson*, 2 Peters, 314.

The defendants admit that the instructions given by the court below as to the question of damages is correct as a general rule, but claim that the rule was not applicable to, and tended to mislead the jury in the case at bar. However good the intentions and purposes of the defendants may in fact have been—if we are right in our view of the law as above expressed—they committed against the plaintiffs a willful and unlawful act, from which flowed all the damages they sustained. The suing out of process, and the delivery of the goods to the officer having it, is part of the same transaction, and, in the eye of the law, willfully set on foot and consummated by the defendants against the plaintiffs. The defendants, in our view of the case, wrongfully and unlawfully seized and carried away the plaintiff's goods and property. They falsely represented to a proper officer that they had properly taken them, that they were subject to seizure and condemnation, and did thereby induce such officer to take out process and take these same goods off their hands. The officer, as soon as he became correctly informed and advised of the facts, returned the goods to the plaintiffs. Upon this state of facts, we have no doubt that the plaintiffs are entitled to recover from the original trespassers the difference in the value of the goods when and where taken and the value of the goods when and where returned.

All the damages are unquestionably the result of the unlawful acts of the defendants and such as would reasonably

be expected to follow such acts, and ought not to be apportioned or qualified.

All the damages and injury were a part of the chain of effects resulting from these acts, and the defendants, if liable at all, are liable at least for the damages actually sustained by the plaintiffs from these unlawful acts as naturally flowing therefrom.

We are satisfied that the rule as to what may be shown in mitigation of actual damages sustained in actions of trespass should be limited to evidence of actual benefits received by the plaintiffs, after the trespass, from the property taken. Under this rule, if after property has been taken in trespass from the owner, an execution against him is levied thereon and the property sold, and a judgment against the owner thereby satisfied, this we think could and ought to be shown in mitigation of damages: So if the whole or a part of the property has been returned to the plaintiff before trial, etc.; but this rule has been doubted, and able jurists have held that no application of the property without the owner's consent would be available in mitigation of damages. *Hanmer v. Wilsey*, 17 Wend., 91; but we think the law will presume the assent of the owner to such application of the property as is for his benefit to the extent of such benefit.

But where as in this case the verdict is only for the actual damages sustained after deducting all benefits derived by the plaintiffs from the return of some portion of the goods, it was incompetent to show in mitigation of damages, that after the trespass was committed and before the goods were returned they were in the custody of the law, under and by virtue of process, for the purpose of enabling the jury to deduct from the aggregate damage, the damage done the goods while in such custody. And if under the old practice a portion of the damages only could have been proved and recovered in an action *vi et armis*, and another portion only in an action of *trespass on the case*, still, under our *code*, all may be shown and recovered under the complaint stating the simple facts. All distinction in the old forms having been abolished, all may be recovered that flowed from the original

trespass. The original trespassers must respond to the extent of the damages. Greenleaf on Evidence, Vol. 2, Redfield's edition, 1868, page 550, and notes and authorities there cited; Sedgwick on the Measure of Damages, 5th edition, 615, 617, 618, Note 1, and authorities.

We find no error in the record. The judgment below is

AFFIRMED.*

*Appealed to and affirmed by the Supreme Court of the United States, December, 1877.