#23492-aff in pt & rev in pt-JKM & DG
**2006 SD 8**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

ROBERT BENSON, JUDITH BENSON,
JEFF MESSMER, and TRICIA MESSMER,                Plaintiffs and Appellees,


        v.


STATE OF SOUTH DAKOTA,
M. MICHAEL ROUNDS, in his
official capacity as Governor
of the State of South Dakota;
LARRY LONG, in his official
capacity as Attorney General
of the State of South Dakota;
SOUTH DAKOTA DEPARTMENT
OF GAME, FISH & PARKS; and
JOHN COOPER, in his official
capacity as Secretary of the
South Dakota Department of
Game, Fish & Parks,                                         Defendants and Appellants.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SIXTH JUDICIAL CIRCUIT
TRIPP COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE KATHLEEN F. TRANDAHL
Judge

\* \* \* \*

ARGUED ON AUGUST 31, 2005

OPINION FILED **01/24/06**

\* \* \* \*

CHRISTOPHER D. DOHRER of
Richardson, Wyly, Wise,
  Sauck & Hieb. LLP
Aberdeen, South Dakota

J. SCOTT DETAMORE
JOSEPH F. BECKER
WILLIAM PERRY PENDLEY
Mountain States Legal Foundation          Attorneys for plaintiffs
Lakewood, Colorado                        and appellees.


LAWRENCE E. LONG
Attorney General

CRAIG M. EICHSTADT
ROBERT E. MAYER
Deputy Attorneys General                  Attorneys for defendants
Pierre, South Dakota                      and appellants.

#23492

[¶1.]        MEIERHENRY, Justice and GILBERTSON, Chief Justice

[¶2.]        **Justice Judith K. Meierhenry delivers the opinion of the Court on Issue 1, which holds that the circuit court had jurisdiction to consider this action.**

[¶3.]        **Justice Judith K. Meierhenry delivers the opinion of the Court on Issue 2, which holds that Landowners have standing to challenge the statute at issue.**

[¶4.]        **Chief Justice David Gilbertson delivers the opinion of the Court on Issue 3, which holds that the challenged statute does not constitute a compensable taking under the United States Constitution or the South Dakota Constitution.**

[¶5.]        **MEIERHENRY, Justice, writing for the Court on Issues 1 and 2.**

[¶6.]        Landowners, Robert and Judith Benson and Jeff and Patricia Messmer (hereinafter Landowners), brought this action seeking declaratory and injunctive relief against the State of South Dakota, a state agency, and certain state officials. Landowners challenge the constitutionality of SDCL 41-9-1.1(2), which addresses the shooting of small game from a public right-of-way. The circuit court found that SDCL 41-9-1.1(2) constitutes a taking of private property without just compensation in violation of the United States and South Dakota Constitutions. On appeal, the State contests that decision. The State also asserts that the circuit court lacked jurisdiction to grant a declaratory judgment and that Landowners lacked standing to challenge SDCL 41-9-1.1(2). Through separate opinions, we hold that the circuit

-1-

court had jurisdiction to grant a declaratory judgment and that Landowners had standing, however we hold that SDCL 41-9-1.1(2) is not a taking within the meaning of the Fifth Amendment of the United States Constitution and article VI, section 13 of the South Dakota Constitution.  Affirmed in part and reversed in part.

## FACTUAL AND PROCEDURAL BACKGROUND

[¶7.]      The Bensons reside on and operate a ranch in Tripp County, South Dakota.  The ranch operates primarily for agricultural purposes, which include the raising of livestock and a variety of crops.  The Messmers reside on and operate a farm in Jerauld County, South Dakota.  The Messmer farm is a cattle and grain operation.  Both the Bensons and the Messmers also operate private hunting lodges and maintain private hunting preserves on their properties.  The Benson ranch includes a parcel cultivated exclusively for pheasant habitat.

[¶8.]      South Dakota law requires hunters to obtain the permission of property owners before hunting on private property.  SDCL 41-9-1.  The permission requirement, however, does not apply to highways or other public rights-of-way except for certain safety zones, that is, within six hundred sixty feet of an occupied dwelling, a church, a schoolhouse, or livestock.  SDCL 41-9-1.1.  In 2003, the South Dakota Legislature amended SDCL 41-9-1.1 by adding the following language:

> For purposes of this section, hunting on highways or other public rights-of-way includes:
>
> (1)    The shooting at or taking by legal methods of small game, except mourning dove, that are located within the boundaries of the highway or public right-of-way;
>
> (2)    The shooting at or taking by legal methods of small game, except mourning dove, that are in flight over

> private land if the small game has either originated from or has taken flight from the highway or public right-of-way or if the small game is in the process of flying over the highway or public right-of-way.
>
> If subdivision (2) of this section is declared by an advisory opinion or adjudication of the South Dakota Supreme Court to be a taking of private property requiring compensation, subdivision (2) is void.

SDCL 41-9-1.1.

[¶9.] Landowners contend that subsection two results in a taking of their property without just compensation in violation of article VI, section 13 of the South Dakota Constitution and the Fifth Amendment of the United States Constitution. They assert that SDCL 41-9-1.1(2) prevents them "from excluding members of the public from shooting onto their ranch or farmland while hunting in the public rights-of-way that border [their] properties." Several miles of public rights-of-way in the form of county and township roads bordering Landowners' properties are used by the public for road hunting. The roads that border the Bensons' pheasant preserve are particularly attractive to road hunters.

[¶10.] Landowners brought suit against the State of South Dakota and the South Dakota Department of Game, Fish, and Parks (GFP), as well as Governor M. Michael Rounds, Attorney General Larry Long, and GFP Secretary John Cooper in their official capacities (collectively State). In addition to claiming that SDCL 41-9-1.1(2) constitutes an unconstitutional taking, Landowners asserted that the state officials violated 42 USC § 1983 by depriving them of their constitutional rights under color of law. Landowners asked the circuit court to declare that SDCL 41-9-1.1(2) results in an unconstitutional taking of private property without just

compensation. Landowners also sought injunctive relief preventing the State's enforcement of SDCL 41-9-1.1(2).

[¶11.]     Because the case presented no genuine issues of material fact, Landowners and the State filed cross motions for summary judgment. The circuit court granted summary judgment in favor of Landowners. On appeal, the State raises the following issues:

## ISSUES

1.   Whether the circuit court had jurisdiction to grant a declaratory judgment against the State or officials of the State acting in their official capacities.

2.   Whether Landowners lack standing to challenge criminal prohibitions under which they are not threatened.

3.   Whether the circuit court erred when it held that SDCL 41-9-1.1(2) constitutes a taking of Landowners' property within the meaning of the Takings Clause of the Fifth Amendment of the United States Constitution and article VI, section 13 of the South Dakota Constitution.

## DECISION

[¶12.]     *1.    Whether the circuit court had jurisdiction to grant a declaratory judgment against the State or officials of the State acting in their official capacities.*

[¶13.]     The State asserts that the circuit court lacked jurisdiction to hear Landowners' declaratory judgment action against the State. Whether the circuit court had jurisdiction is a question of law to be reviewed *de novo*. Dakota Systems, Inc. v. Viken, 2005 SD 27, ¶7, 694 NW2d 23, 27. The State first asserts that the doctrine of sovereign immunity bars this suit. The State admits that under the *Ex parte Young* doctrine, the Court may hear an action alleging that state officials are acting unconstitutionally. *See* 209 US 123, 28 SCt 441, 52 LEd 714 (1908). The

State, however, maintains that the state officials are taking no action and that they are merely "refusing to implement a criminal prohibition that no longer exists." The State argues that sovereign immunity bars a declaratory judgment action against the State or its officials. Further, even if such an action may be brought, the State argues it does not present a justiciable controversy.

[¶14.] In light of settled precedent, we find no merit to the State's argument. We have recognized that the right to just compensation "is a right of the strongest character" and is "a self-executing constitutional provision." SDDS, Inc. v. State, 2002 SD 90, ¶22, 650 NW2d 1, 9. As such, "the remedy does not depend on statutory facilitation." *Id.* Therefore, common law actions may be brought against the State and its officers even though no express consent has been given. *See* Darnall v. State, 79 SD 59, 108 NW2d 201 (1961) (allowing an action under article VI, section 13 of the South Dakota Constitution against the state, the governor, and members of the state highway commission). As we stated in *Darnall*,

> Where a state or an agency thereof acting in a sovereign capacity takes or damages private property for public use without exercising the power of eminent domain, it cannot evade the constitutional provision which guarantees the right to compensation but will be obligated to pay the same as if it had proceeded under that power. The constitution should bind officers and agents of the state and the state should not by indirect action be permitted to violate it. It expects and demands compliance by its citizens and they have the correlative right to expect that from the state.

79 SD at 65-66, 108 NW2d at 204 (citations omitted).

[¶15.] Additionally, we recognized in *SDDS, Inc.*, that "South Dakota's sovereign immunity is not a bar to [a] Fifth Amendment takings claim." 2002 SD 90, ¶20, 650 NW2d at 8-9. "'[T]he constitutional privilege of a state to assert its

sovereign immunity in its own courts does not confer upon a state a concomitant right to disregard the [United States] Constitution,'" and "'[t]he states and their officers are bound by obligations imposed by the Constitution.'" *Id.* (quoting Alden v. Maine, 527 US 706, 754, 119 SCt 2240, 2266, 144 LEd2d 636 (1999)). We have also recognized that a declaratory judgment action is a proper method of bringing a constitutional question before the court. Dan Nelson, Auto., Inc. v. Viken, 2005 SD 109, ¶30, 706 NW2d 239, 251 (finding "rather novel" the notion that "states are generally immune from suits for declaratory relief"); *Dakota Systems, Inc.*, 2005 SD 27, ¶9, 694 NW2d at 28 (finding that sovereign immunity does not bar a declaratory judgment action against a state official); *see also Ex parte Young*, 209 US 123, 28 SCt 441, 52 LEd 714; White Eagle Oil & Refining Co. v. Gunderson, 48 SD 608, 205 NW 614 (1925) (applying the *Ex parte Young* doctrine).

[¶16.]	Finally, we reject the State's claim that no justiciable controversy has been presented. Under the Declaratory Judgments Act, any person whose rights are affected by a statute may obtain a declaration of rights. SDCL 21-24-3. We have said that in order for a court to have jurisdiction over a declaratory judgment action, there must be "'a justiciable controversy; that is to say, a controversy in which a claim of right is asserted against one who has an interest in contesting it.'" Danforth v. City of Yankton, 71 SD 406, 412, 25 NW2d 50, 53 (1946) (citation omitted). Landowners, as property owners, have a claim of right to their property. Thus, their allegation that the State's actions result in an unconstitutional taking is sufficient to present a justiciable controversy. Landowners have properly

-6-

challenged the constitutionality of SDCL 41-9-1.1(2) by proceeding against the State and its officials in this declaratory action.

**[¶17.]** **GILBERTSON, Chief Justice, KONENKAMP, ZINTER, Justices, and JOHNSON, Circuit Judge, concur.**

[¶18.] 2. *Whether Landowners lack standing to challenge criminal prohibitions under which they are not threatened.*

[¶19.] The State claims that Landowners lack standing to challenge the constitutionality of SDCL 41-9-1.1(2). "The question of whether a party has standing to maintain an action is a question of law reviewable by this Court *de novo.*" Fritzmeier v. Krause Gentle Corp., 2003 SD 112, ¶10, 669 NW2d 699, 702. According to the State, Landowners lack standing for three reasons. First, Landowners have not been threatened with prosecution under SDCL 41-9-1.1(2), and they "have no standing to challenge a failure to prosecute someone else." Second, Landowners "lack authority to demand that certain acts remain criminal after the Legislature has repealed their prohibition." Third, the circuit court "lacks the authority to adopt a criminal prohibition where it has been repealed by the [L]egislature."

[¶20.] In response, Landowners argue that the State mischaracterizes their claims. They "neither 'challenge a criminal prohibition under which they are not threatened' nor 'judicially assert that certain activity must be [made] criminal.'" We agree with Landowners. Landowners do not assert that SDCL 41-9-1.1(2) accomplishes a taking of their property by decriminalizing an act. In their complaint, Landowners allege that:

-7-

44. Section 41-9-1.1(2) denies [Landowners] the right to prevent others from shooting onto their property.  Section 41-9-1.1(2) denies [Landowners] the right to exclude others from recreating on their property, as well as the right to prevent the projection and disposition of objects onto their property.
45. Section 41-9-1.1(2) denies [Landowners] valuable hunting and fishing rights appurtenant to and separable from their property as provided by [SDCL] 43-13-1.
46. Section 41-9-1.1(2) subjects [Landowners] and their families, employees, and guests to fear and risk of serious bodily injury or death and subjects [Landowners]' homes, structures, livestock, equipment, crops and land to injury and/or damage.
47. Section 41-9-1.1(2) impairs [Landowners]' full enjoyment and use of their property.

Thus, Landowners consistently argue that the statute subjects them to intrusions of their property.  Landowners do not refer to "decriminalization," nor do they demand prosecution.  Rather, the State asserts the decriminalization argument.

[¶21.]      The State cannot change the nature of the claim in order to oust a court of jurisdiction.  *See* Elliott v. Bd. of County Comm'rs, 2005 SD 92, ¶¶16-17, 703 NW2d 361, 368 (stating that "jurisdiction depends on the pleadings and the prayer for relief" and "'[t]he test for determining jurisdiction is ordinarily the nature of the case, as made by the complaint, and the relief sought'").  Here, Landowners seek relief in the form of a declaratory judgment to establish whether SDCL 41-9-1.1(2) is a taking.  This request comports with the purpose of the Declaratory Judgments Act, which "is to 'declare rights, status, and other legal relations.'"  Kneip v. Herseth, 87 SD 642, 647, 214 NW2d 93, 96 (1974) (citing SDCL 21-24-1).  Further, Landowners' claim falls squarely within the philosophy of the Declaratory Judgments Act.  *Id.* at 647-48.  As we said in *Kneip v. Herseth*,

> The philosophy of the Declaratory Judgment Act establishes that through it the courts seek to enable parties to

> authoritatively settle their rights in advance of any invasion thereof. Within the bounds of the remedial act's command of a liberal construction and liberal administration is found its ultimate goal of allowing "the courts (to be) more serviceable to the people." The achievement of peace through the avoidance of predictable conflict permeates as the Act's main function.

*Id.* at 648 (citations omitted).

[¶22.] Standing to bring an action depends on an allegation by the litigant "'that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant.'" Parsons v. South Dakota Lottery Comm'n, 504 NW2d 593, 595 (SD 1993) (quoting Gladstone, Realtors, et al. v. Bellwood, 441 US 91, 99, 99 SCt 1601, 1608, 60 LEd2d 66 (1979)). The United States Supreme Court has stated that in order to establish standing, a litigant must show: (1) an injury in fact suffered by the plaintiff, (2) a causal connection between the plaintiff's injury and the conduct of which the plaintiff complains, and (3) the likelihood that the injury will be redressed by a favorable decision. Lujan v. Defenders of Wildlife, 504 US 555, 560-61, 112 SCt 2130, 2136, 119 LEd2d 351 (1992).

[¶23.] In this case, Landowners allege that SDCL 41-9-1.1(2) allows the invasion of their property. Such alleged invasion constitutes an actual or threatened injury to Landowners' legally protectible interest in their land. Further, their claimed injury is fairly traceable to SDCL 41-9-1.1(2). Finally, a finding that the alleged invasion is a governmental taking without compensation renders the statutory provision void. *See* SDCL 41-9-1.1. Thus, under the principles set forth

by both this Court and the United States Supreme Court, Landowners have established standing to assert a claim that SDCL 41-9-1.1(2) constitutes a taking.[1]

**[¶24.]** **GILBERTSON, Chief Justice, KONENKAMP, Justice, and JOHNSON, Circuit Judge, concur.**

**[¶25.]** **ZINTER, Justice, concurs specially.**

**[¶26.]** **JOHNSON, Circuit Court Judge, sitting for SABERS, Justice, disqualified.**

ZINTER, Justice (concurring specially).

**[¶27.]** I concur in the Court's opinion to the extent it suggests that Landowners *initially* had standing because they *alleged* SDCL 41-9-1.1(2) constituted a taking under the state and federal constitutions. I concur because, when standing is at issue in the early stages of litigation, "the focus is on the party seeking relief, not on the issues [presented, and] [w]e do not consider whether the party filing the challenge 'will ultimately be entitled to any relief but whether he

---

1.  Despite the fact that both standing jurisprudence and the Declaratory Judgments Act allow Landowners to challenge SDCL 41-9-1.1(2), the State argues that under our decision in *Reis v. Miller*, Landowners lack standing to challenge the "decriminalization" of an act. 1996 SD 75, 550 NW2d 78. The State's reliance on *Reis* is misplaced. In *Reis*, the issue presented was not an unconstitutional taking of private property. *Id.* ¶¶7-9. Rather, the issue was the extent of the easement included in public rights-of-way. *Id.* Further, in *Reis* we declined to analyze the issue of standing as to an equal protection claim. *Id.* ¶24. We did, however, recognize that the landowner had standing to bring a declaratory judgment action, and we proceeded to review the case on that basis. *Id.* ¶24.

has the legal right to seek judicial redress for his grievance.'" *Matter of* Baby Boy K., 1996 SD 33, ¶14, 546 NW2d 86, 90 (internal citations omitted).

[¶28.]	However, I disagree with the Court's opinion to the extent it suggests that the causation element of standing was ultimately proven, *i.e.*, that Landowners' "injury is fairly traceable to SDCL 41-9-1.1(2)." *Supra ¶23.* Although Landowners may be presumed to have satisfied this causation element of standing at the outset of the litigation, the United States Supreme Court has clearly explained that Landowners also bore the burden of proving the causation element of standing throughout all stages of the litigation. *Lujan,* 504 US at 561, 112 SCt at 2136, 119 LEd2d at 364 (citations omitted).[2]

[¶29.]	Furthermore, Landowners bore the burden of proving the causation requirement of standing "in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation." *Id.* (citations omitted). Thus, the manner and degree of proof necessary for Landowners to sustain their standing burden changed from the outset when they *alleged* a takings claim to the final disposition when they were required to *prove* that claim:

> At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a

---

2.	This Court has also recognized the causal connection element of standing. "[S]tanding is satisfied if the litigant can show 'that he personally has suffered some actual or threatened injury *as a result of* the putatively illegal conduct of the Defendant.'" Edgemont Sch. Dist. 23-1 v. South Dakota Dep't of Revenue, 1999 SD 48, ¶16, 593 NW2d 36, 40 (quoting Agar Sch. Dist. No. 58-1 v. McGee, 527 NW2d 282, 284 (SD 1995) (citing *Parsons,* 504 NW2d 593, 595 (quoting *Gladstone, Realtors,* 441 US at 99, 99 SCt at 1608, 60 LEd2d at 76))) (emphasis added).

> motion to dismiss we "presum[e] that general allegations embrace those specific facts that are necessary to support the claim." *National Wildlife Federation, supra,* 497 US at 889, 110 SCt at 3189. In response to a summary judgment motion, however, the plaintiff can no longer rest on such "mere allegations," but must "set forth" by affidavit or other evidence "specific facts," FedRule CivProc 56(e), which for purposes of the summary judgment motion will be taken to be true. And at the final stage, those facts (if controverted) must be "supported adequately by the evidence adduced at trial." *Gladstone, supra,* 441 US at 115, n31, 99 SCt at 1616, n31.

*Lujan*, 504 US at 561, 112 SCt at 2137, 119 LEd2d at 364-65. Therefore, the mere fact that Landowners may be presumed to have standing to plead and litigate their takings claim does not mean that they necessarily satisfied their burden of proving standing on the merits.

[¶30.] In this case, the causal connection element of standing is also a required element of Landowners' takings claim. *See supra* ¶22 (citing *Lujan*, 504 US at 560-61, 112 SCt at 2136, 119 LEd2d at 364), and *infra* ¶¶57-74, 83 (analyzing Landowners' takings claim). Consequently, in order to maintain standing and prove their takings claim on the merits, Landowners were required to prove causation between the claimed injury (invasion of their property) and the conduct of which they complain (legislation decriminalizing certain types of hunting on public rights-of-way).

[¶31.] Landowners' burden of proving this causal connection for standing is especially high in this case because they are challenging a regulation (or more properly, the non-regulation) of parties who are not before the Court, *i.e.,* private individuals who engage in hunting on public rights-of-way. Landowners' burden is especially high because, when an individual challenges the legality of government

action or inaction, the extent of the burden of establishing the elements of standing will depend on whether the plaintiff is the object of the action or inaction. *Lujan*, 504 US at 561-62, 112 SCt at 2137, 119 LEd2d at 365. If the plaintiff is the object of the government's action or inaction, "there is ordinarily little question that the action or inaction has caused [the] injury, and that a judgment preventing or requiring the action will redress it." *Id.* However, if the "plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else,* much more is needed." *Id.* at 562.

> In that circumstance, causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction--and perhaps on the response of others as well. The existence of one or more of the essential elements of standing "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict," . . . and it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury.

*Id.* (internal citations omitted). Therefore, in cases like this where the statutes at issue regulate the criminality of hunting by private individuals, rather than the conduct of plaintiff Landowners, "standing is not precluded, but it is ordinarily '*substantially more difficult*' to establish." *Id.* (emphasis added) (citations omitted).

[¶32.] In this case, Landowners failed to meet this difficult standing burden because, as the Court explains in Issue 3, the State's passage of SDCL 41-9-1.1(2) was not the legal cause of Landowners' injury. *See infra* ¶¶57-74, 83. SDCL 41-9-1.1(2) was not the legal cause of Landowners' injury because the statute is nothing more than the definitional part of a criminal regimen regulating hunting by private

individuals. The criminal nature of the regulation is undeniable. SDCL 41-9-1 makes it a Class 2 misdemeanor to hunt "upon any private land not his own or in his possession without permission from the owner or lessee of such land." And, SDCL 41-9-1.1(2), the statute Landowners challenge, simply defines the types of hunting on the rights-of-way that are and are not subject to the criminal proscription in SDCL 41-9-1. SDCL 41-9-1.1(2) provides in relevant part: "§ 41-9-1 [the criminal proscription] does not apply to ... [t]he shooting at or taking by legal methods of small game ... that are in flight over private land if the small game has either originated from or has taken flight from the highway or public right-of-way."

[¶33.] The Court acknowledges the fact that this is a criminal statute but contends that the State has "mischaracterize[d]" Landowners' claim. *Supra* ¶20. I agree that the State cannot mischaracterize the nature of Landowners' claim to defeat standing at the pleading stage. However, at the same time, Landowners cannot ignore the legal effect of SDCL 41-9-1.1(2) in satisfying their burden of proof regarding standing on the merits. The legal effect of this statute is that it defines the type of conduct that subjects individual hunters to a criminal prosecution. But, Landowners "lack[] a judicially cognizable interest in the prosecution or non-prosecution of another." Linda R. S. v. Richard D., 410 US 614, 619, 93 SCt 1146, 1149, 35 LEd2d 536 (1973). Because Landowners lack a judicially cognizable interest in the prosecution or non-prosecution of the individual hunters, Landowners cannot establish the causal connection necessary to maintain standing in the merits stage of this litigation. *Id.* (concluding that "given the special status of criminal prosecutions in our system," a person has no standing to challenge the

-14-

failure to prosecute another even though that person may suffer an injury due to the failure to prosecute).

[¶34.] The Court recognizes the causal connection requirement of *Lujan* and concludes that Landowners' injury, the invasion of their property, is "fairly traceable" to this statute. *See supra* ¶¶22-23. However, the Court errs in this conclusion because it only cites a portion of the causation rule. The entire rule provides: "there must be a causal connection between the injury and the conduct complained of -- the injury has to be 'fairly ... trace[able] to the challenged action of the defendant, *and not ... th[e] result [of] the independent action of some third party not before the court.'*" *Lujan*, 504 US at 560, 112 SCt at 2136, 119 LEd2d at 354 (emphasis added) (citation omitted). If the entire causation rule is acknowledged and applied, it is evident that Landowners failed to prove standing. They failed to prove standing because their injury is only caused when third party hunters, who are not before the court, choose to shoot into Landowners' airspace.

[¶35.] Because the third-party hunters are the legal cause of Landowners' injury, Landowners have failed to meet their burden of proving standing on the merits.[3] Consequently, I decline to join that portion of the Court's opinion broadly stating that Landowners' injury was "fairly traceable" to the statute decriminalizing certain types of hunting in the rights-of-way.

---

3. Although I would address Landowners' taking claim as a part of the standing issue, I fully concur in the Court's takings analysis in Issue 3.

[¶36.] **GILBERTSON, CHIEF JUSTICE, writing for the Court on Issue 3.**

[¶37.] *3. Whether the circuit court erred when it held SDCL 41-9-1.1(2) constitutes a taking of Landowners' property within the meaning of the Takings Clause of the Fifth Amendment of the United States Constitution, and article VI, section 13 of the South Dakota Constitution*

[¶38.] Landowners brought this action seeking declaratory and injunctive relief against the State, GFP and certain state officials. Landowners challenge the constitutionality of SDCL 41-9-1.1(2), which decriminalizes the shooting of small game birds that have taken flight from or fly over a public right-of-way. The circuit court found SDCL 41-9-1.1(2) constitutes a taking without just compensation in violation of the Fifth Amendment of the United States Constitution and article VI, section 13 of the South Dakota Constitution. We reverse on Issue 3.

[¶39.] Statutory interpretation is an issue of law to be reviewed *de novo*. Block v. Drake, 2004 SD 72, ¶8, 681 NW2d 460, 463 (citing Steinberg v. State Dept. of Military Affairs, 2000 SD 36, ¶6, 607 NW2d 596, 599). An appeal asserting an infringement of a constitutional right is also an issue of law to be reviewed under the *de novo* standard of review. State v. Dillon, 2001 SD 97, ¶12, 632 NW2d 37, 43 (citing State v. Stanga, 2000 SD 129, ¶8, 617 NW2d 486, 488). Under the *de novo* standard of review, we give no deference to the circuit court's conclusions of law. Sherburn v. Patterson Farms, Inc., 1999 SD 47, ¶4, 593 NW2d 414, 416 (citing City of Colton v. Schwebach, 1997 SD 4, ¶8, 557 NW2d 769, 771).

[¶40.] Challenges to the constitutionality of a statute face a significant and heavy burden. Meinders v. Weber, 2000 SD 2, ¶10, 604 NW2d 248, 254 (quoting

Sedlacek v. South Dakota Teener Baseball Program, 437 NW2d 866, 868 (SD 1989) (quoting Oien v. City of Sioux Falls, 393 NW2d 286, 289 (SD 1986))).  There is a strong presumption that a statute is constitutional.  State v. Asmussen, 2003 SD 102, ¶2, 668 NW2d 725, 728 (citing State v. Allison, 2000 SD 21, ¶5, 607 NW2d 1, 2).  "In order to prevail, a successful challenge must refute this presumption beyond a reasonable doubt."  *Id.* (citing State v. McGill, 536 NW2d 89, 94 (SD 1995)).  "If a statute can be construed so as not to violate the constitution, that construction must be adopted."  Wegleitner v. Sattler, 1998 SD 88, ¶4, 582 NW2d 688, 689 (quoting Cary v. City of Rapid City, 1997 SD 18, ¶10, 559 NW2d 891, 893 (citing Simpson v. Tobin, 367 NW2d 757, 766 (SD 1985))).

[¶41.]      The Takings Clause of the Fifth Amendment provides in relevant part: "nor shall private property be taken for public use, without just compensation."  US Const. amend V.  It is applicable to the states through the Due Process Clause of the Fourteenth Amendment.  Lingle v. Chevron USA, Inc., ___ US ___, ___, 125 SCt 2074, 2080, 161 LEd2d 876 (2005) (citing Chicago, B. & Q. R. Co. v. Chicago, 166 US 226, 17 SCt 581, 41 LEd 979 (1897)).  Article VI, section 13 of the South Dakota Constitution provides:  "Private property shall not be taken for public use, or damaged,[4] without just compensation, which will be determined according to legal procedure established by the Legislature and according to § 6 of this article."

---

4.      The Landowners' claim is really about damage to real property, not an outright permanent taking.  Article VI, section 13 of the South Dakota Constitution also provides compensation for damage to private property which is not permissible under the law.  Originally this "damage" provision was not part of our proposed State Bill of Rights but rather the 1883 Constitutional Convention adopted the language of the Federal Constitution.

(continued . . .)

[¶42.] The issue of what constitutes a "public use" has been a subject of frequent litigation. Recently in *Kelo v. City of New London*, ___US___, 125 SCt 2655, 162 LEd2d 439 (2005), the United States Supreme Court concluded that a taking from one private party that will ultimately go to another private party complies with this standard as long as "it embraced … the broader and more natural interpretation of public use as 'public purpose.'" *Id.* at 2657. However, the Court recognized that the states were free "to impose 'public use' requirements that are stricter than the federal baseline." *Id.* at 2668. South Dakota has consistently done so. In its interpretation of article VI, section 13, this Court adopted the "use by the public test." Illinois Central R.R. Co. v. East Sioux Falls Quarry Co., 33 SD 63, 144 NW 724 (1913). This definition requires that there be a "use or right of use on the part of the public or some limited portion of it[.]" *Id.* at 77, 144 NW at 728. In that case, we did consider the alternate "public benefit" rule but opted for the "use by the public" rule. *Id.*

> The reasons which incline us to this view are, first, that it accords with the primary and more commonly understood meaning of the words; second, it accords with the general practice in regard to taking private property for public use in vogue when the phrase was first brought into use in the earlier Constitutions; third, it is the only view which gives the words

_____

(. . . continued)

*See* Constitution Convention of 1883, South Dakota Historical Collections, vol XXI, 342 (State Historical Society, 1942). However, the 1885 Constitutional Convention, after some debate, included the term "damage." Constitutional Debates of South Dakota, vol 1, at 292-299. This "damage" clause would ultimately be adopted by the 1889 Constitutional Convention and become part of our South Dakota Constitution. Constitutional Debates of South Dakota, vol 2 at 133. *See also* Richards v. Washington Terminal Co., 233 US 546, 554, 34 SCt 654, 657, 58 LEd 1088 (1914).

> any force as a limitation or renders them capable of any definite and practical application.

*Id.* at 78, 144 NW at 728. Thus, our state constitution provides its landowners more protection against a taking of their property than the United States Constitution. *Cf.* State v. Opperman, 247 NW2d 673, 674 (SD 1976) (citing Oregon v. Hass, 420 US 714, 95 SCt 1215, 43 LEd2d 570 (1975)) (holding that the South Dakota Supreme Court has the power to interpret our state constitution as providing an individual with greater protection than the Federal Constitution) (footnote omitted). The "use by the public" standard continues to be the law of this jurisdiction. *See* Great Northern Ry. Co. v. Chicago, St. P., M. & O. Ry. Co., 78 SD 168, 175-176, 99 NW2d 439, 443 (1959); Frawley Ranches, Inc. v. Lasher, 270 NW2d 366, 369 (SD 1978).

[¶43.] Examination of this constitutional issue cannot be conducted in a historical vacuum. In a concurrence in *Reis v. Miller*, 1996 SD 75, ¶¶28-31, 550 NW2d at 84-85, (Gilbertson, J., concurring), a portion of the history of South Dakota hunting laws was set forth:

> Historically, there is no support for the contention of the Plaintiffs that the Territorial Legislature in 1870, when accepting the rights-of-way easement from the Federal Government by enacting what is now SDCL 31-18-1, somehow intended to limit or preclude hunting from these ribbons of real estate. During the Territorial period, no limitations can be found on hunting anywhere although I presume that a landowner could maintain an action for trespass for entering on his land without his permission. *See* Clark v. Bates, 1 Dakota 42, 46 NW 510 (1874), *aff'd,* 95 US 204, 24 LEd 471 (1877). However, acts committed within the section line were not held to be a trespass upon the adjoining landowner's real property. State v. Bonine, 41 SD 231, 170 NW 138 (1918). As to wild game specifically, it was not until 1899 that the South Dakota Legislature passed its first limitation on hunting anywhere in

the State, by requiring the owners' permission to hunt on private land.  *See* SDCL 41-9-1.

At common law, wild game was deemed to be the property of the sovereign or state and not of the private real property owner. State v. Pollock, 42 SD 360, 365, 175 NW 557, 558 (1919). Therein we stated:

> This power of the state is based largely on the circumstance that the property right to the wild game within its borders is vested in the people of the state in their sovereign capacity; and as an exercise of its police powers and to protect its property for the benefit of its citizens, it is not only the right, but it is the duty of the state to take such steps as shall preserve the game from the greed of hunters....  The right to kill the game is a boon or privilege granted either expressly or impliedly by the sovereign authority and is not a right inhering in any individual....

42 SD at 365-66, 175 NW at 559 (quoting 12 RCL 685).  This common law doctrine was reinforced in 1899 by the passage of what is now SDCL 41-1-2, which provides in part, that "any game bird, game animal, or game fish ... shall always and under all circumstances be and remain the property of the state...." Eighty-two years were to go by until the Legislature sought to limit hunting within certain rights-of-way simply because of that realty's status by the amendment of SDCL 41-9-1.1 to that effect.  State v. Peters, 334 NW2d 217, 221 (SD 1983).  Prior to that time, the only applicable statutory hunting restrictions in existence were those generally pertaining to hunting such as bag limits or for the protections of farm buildings, fields and schools. *See* SDC 1939, § 25.0427.

[¶44.]     Although the law concerning hunting regulation upon private property rather than public rights-of-way has been evolving since the commencement of regulation in 1899, it is a fair summary that for the most part, it has been an evolution from no regulation commencing at statehood in 1889 to that of increasing

regulation and criminal restrictions upon hunters to protect private landowners.[5]

The challenged amendments to SDCL 41-9-1.1(2) are not consistent with that trend.

---

5.  The original regulation of 1899 criminalized the act of taking game from private lands if hunters "knowingly hunted on enclosed, occupied, or cultivated lands of another without the consent of the owner or tenant[.]" Rev SD Political Code § 3054 (1903) (codified as SDCL 41-9-1).  The 1899 law was amended to provide for posting of private lands.  SL 1909, ch 240, § 25.  Under this law, a person could hunt almost anywhere unless the land was posted "NO HUNTING" in the English language in conspicuous places.  To the extent that growing or standing grain fields were involved, permission was required from the landowner.  *Id.*  In 1919 the law was amended so as to provide that permission was required on all cultivated lands, not just grain fields.  SL 1919, ch 216, § 10511.  The law was again amended in 1925 so as to delete the requirement of cultivated lands.  SL 1925, ch 175, § 10511.  Posting was required for all lands as of 1925.  *Id.*  In 1929, the Legislature amended the statutes to require permission of the landowner if the land was enclosed with a woven wire fence.  SL 1929, ch 136, § 10511.
    SDCL 41-9-1 and 41-9-1.1 trace their roots to 1947 when the Legislature passed the following statute:

> Farm land protected.  No person shall enter upon any land not his own or in his possession, which is fenced with woven wire, or land upon which there is farm livestock, or land upon which there is unharvested grain, or land which is within forty rods of occupied farm buildings or schoolhouse without permission from the owner or lessee of such nor shall any person enter upon any land or lands not his own or in his possession with intent to take or kill any bird or animal, after being notified by the owner or lessee not to do so.  Such notice may be given orally or by posting written or printed notices to that effect in the English language not more than eighty rods apart, in conspicuous places around the land so protected.  This section shall be printed on all hunting licenses.

SL 1947, ch 112, § 1.
This subject matter has obviously continued to be one of great concern for the Legislature as it has revisited this statute with amendments in 1949, 1951, 1953, 1955, 1964, 1967, 1968, 1972, 1973, 1981, 1988, 1992, 1996 and 2003.  *See* SL 1949, ch 94; SL 1951, ch 121; SL 1953, ch 107; SL 1955, ch 83; SL 1964, ch 79; SL 1967, ch 86; SL 1968, ch 100; SL 1972, ch 225; SL 1973, ch 269, § 1-2; SL 1974, ch 278; SL 1981, ch 299, § 1, § 4; SL 1988, ch 337; SL

(continued . . .)

#23492

[¶45.] SDCL 41-9-1.1(2) provides in relevant part:

> The shooting at or taking by legal methods of small game, except mourning dove, that are in flight over private land if the small game has either originated from or has taken flight from the highway or public right-of-way or if the small game is in the process of flying over the highway or public right-of-way.

> If subdivision (2) of this section is declared by an advisory opinion or adjudication of the South Dakota Supreme Court to be a taking of private property requiring compensation, subdivision (2) is void.

The object of SDCL 41-9-1.1(2) is to define what constitutes criminal versus non-criminal conduct when hunting on rights-of-way section lines or highways. SDCL 41-9-1.1(2) does not seek to impose a limitation on the conduct of landowners or on the use of their property. Therefore, we must analyze the facts as brought forth by the Landowners in order to determine if the actions of the hunters who act in compliance with SDCL 41-9-1.1(2) and the 2003 GFP Hunting Handbook result in a taking within the meaning of the Fifth Amendment Takings Clause and article VI, section 13 takings jurisprudence, as was concluded by the circuit court.[6]

_____

(. . . continued)
> 1991, ch 337, § 62; SL 1992, ch 293, § 13; SL 1996, ch 252, § 1; SL 2003, ch 225, § 1.

6. Landowners go to great lengths to characterize their claims as something other than an objection to the Legislature's decriminalization of this one aspect of "road hunting." However, the true nature of their claim is revealed by all parties' agreement (including the circuit court's decision) that SDCL 41-9-1.1(2) was enacted in response to *State v. Rumpca*, 2002 SD 124, 652 NW2d 795, a case upholding Rumpca's *criminal trespass conviction* for shooting from a right-of-way at a bird flying over private land. Despite the true nature of Landowners' claim, the merits of their takings claim must be addressed. However, outside of that, Landowners' arguments as to the decriminalization cannot be addressed due to their lack of standing. Landowners have no standing because the United States Supreme Court has

(continued . . .)

#23492

[¶46.] The purpose of the Takings Clause under the Fifth Amendment is not to prohibit all governmental takings or interference with private property, but rather to require compensation be paid by the government "in the event of otherwise proper interference amounting to a taking." *Lingle*, ___ US at ___, 125 SCt at 2080, 161 LEd2d 876 (quoting First English Evangelical Lutheran Church of Glendale v. County of Los Angeles, 482 US 304, 315, 107 SCt 2378, 2386, 96 LEd2d 250 (1987)). A plaintiff seeking redress against the government under a regulatory takings claim must proceed under one of four theories: plaintiff must allege either 1) a *per se* regulatory physical taking under *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 US 419, 102 SCt 3164, 73 LEd2d 868 (1982), "where government requires an owner to suffer a permanent physical invasion of her property"; 2) a *per se* total regulatory taking under *Lucas v. South Carolina Coastal Council,* 505 US 1003, 112 SCt 2886, 120 LEd2d 798 (1992), that deprives an owner of "*all* economically beneficial uses of the property"; 3) a regulatory taking under *Penn Central Tranps. Co. v. City of New York,* 438 US 104, 98 SCt 2646, 57 LEd2d 631 (1978), when a temporary or partial taking is alleged; or 4) a land-use exaction

_____

(. . . continued)
made it unequivocally clear that even though a person may suffer injury from a lack of prosecution, given the "special status of criminal prosecutions in our system," that person has no standing to challenge the failure to prosecute any particular criminal offense. *Linda R.S.*, 410 US at 619, 93 SCt at 1149, 35 LEd2d 536. That is because "in American jurisprudence at least, a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another." *Id. See also* Leeke v. Timmerman, 454 US 83, 85-87, 102 SCt 69, 70-71, 70 LEd2d 65 (1982) (citing *Linda R.S.*, 410 US at 619, 93 SCt at 1149, 35 LEd2d 536) (prison inmates lacked standing to challenge actions of correctional facility officials who influenced prosecutor to
(continued . . .)

violating the standards as set forth in *Nollan v. California Coastal Comm'n.*, 483 US 825, 107 SCt 3141, 97 LEd2d 677 (1987), and *Dolan v. City of Tigard*, 512 US 374, 114 SCt 2309, 129 LEd2d 304 (1994). *Lingle*, ___ US at ___, 125 SCt at 2081-82, 2086-87, 161 LEd2d 876.

[¶47.] Landowners argue a *per se* regulatory physical taking was effectuated by the passage of SDCL 41-9-1.1(2), as the conduct permitted under the statute and as described by the 2003 GFP Hunting Handbook has resulted in a permanent physical invasion of their property. In the alternative, Landowners argue that if this Court finds no *per se* regulatory physical taking, there was a partial or temporary regulatory taking under *Penn Central* that unreasonably interfered with their distinct investment-backed expectations and background principles of South Dakota property law. The State contends that neither a *per se* regulatory physical taking nor a *Penn Central* regulatory taking has occurred, but rather the conduct in question has merely been decriminalized. Landowners do not argue a *per se* total regulatory taking under *Lucas*. Nor is the land-use exaction theory under *Nollan* and *Dolan* applicable to the instant case.

A.     *Per Se Regulatory Physical Taking*

[¶48.] A permanent physical occupation or an appropriation by the government of private property is the most serious form of invasion into an owner's property interests, and constitutes a *per se* regulatory physical taking. *Loretto*, 458

_____

(. . . continued)

oppose issuance of arrest warrant for correctional officers accused of unnecessarily beating inmates).

US at 435, 102 SCt at 3175-76, 73 LEd2d 868.  A *per se* physical occupation occurs when the placement of a "fixed structure on land or real property" is effected by the government or by a third party under the government's direction.  *Id.* at 436-37, 102 SCt at 3176-77, 73 LEd2d 868.[7]  A *per se* physical occupation may also occur when the airspace over land is invaded in such a manner as to prohibit the use of land for any purpose, thereby resulting in a complete loss to the landowner.  United States v. Causby, 328 US 256, 261, 66 SCt 1062, 1065, 90 LEd2d 1206 (1946) (holding airplane flights passing over land "by reason of frequency and altitude of the flights" can constitute a permanent physical occupation and a compensable taking within the meaning of the Fifth Amendment).  However, there is a "constitutional distinction between a permanent physical occupation and a temporary physical invasion."  *Loretto*, 458 US at 434, 102 SCt at 3175, 73 LEd2d 868.  The first effects a compensable taking within the meaning of the Fifth Amendment, but the second does not.  *Id.*  A physical occupation that is less than permanent, and amounts to no more than a temporary physical invasion does not constitute a classic *per se* regulatory physical taking within the meaning of *Loretto.  Id.* (citing PruneYard Shopping Center v. Robins, 447 US 74, 100 SCt 2035, 64 LEd2d 741 (1980)).

[¶49.]     Landowners cite to *Portsmouth Harbor Land & Hotel Co. v. United States*, 260 US 327, 43 SCt 135, 67 LEd 287 (1922) (*Portsmouth II*), as support for their proposition that shots fired over private property constitute a permanent

---

7.     The permanent physical occupation in *Loretto* consisted of the "direct physical attachment of plates, boxes, wires, bolts, and screws to the building, completely occupying space immediately above and upon the roof and along the building's exterior wall."  458 US at 438, 102 SCt at 3177, 73 LEd2d 868.

physical occupation and therefore a compensable taking. However, in that case the United States Supreme Court was called upon to determine if the facts as pleaded by the plaintiff were sufficient to withstand a demurrer, in present day terms a motion for judgment on the pleadings for failure to state a claim. *Id.* at 328, 43 SCt at 136, 67 LEd 287.

[¶50.] The facts as pleaded by the plaintiff in *Portsmouth II* and its companion cases included the mounting of a large battery of cannons "with the intention of firing them over the claimant's land and without the intent or ability to fire them except over that land."[8] *Id.* at 329, 43 SCt at 136-37, 67 LEd 287. In addition, the government had erected a fire control station that the Court noted could be evidence of intent to continue firing the cannons at will across claimant's land. *Id.* The issue hinged, according to the Court's rationale, on whether the firing of the cannons had the result of depriving the owner of the profitable use of the land. *Id.* at 329, 43 SCt at 136, 67 LEd 287. The Supreme Court held that there were sufficient facts alleged by the claimant to reverse the lower court's holding on the demurrer. *Id.* at 330, 43 SCt at 137, 67 LEd 287. The Court noted, "[i]n our opinion the specific facts set forth would warrant a finding that a servitude has

---

8.      The United States government had planned to construct a twelve-gun heavy artillery or battery on the land in 1873. Peabody v. United States, 231 US 530, 536, 34 SCt 159, 159-60, 58 LEd 351 (1913). However, the battery eventually consisted of three ten-inch cannons and two three-inch rapid fire guns by the time *Peabody* was heard in 1913. *Id. See also* Portsmouth Harbor Land & Hotel Co. v. United States, 250 US 1, 39 SCt 399, 63 LEd 809 (1919) (*Portsmouth I*). By the time *Portsmouth II* was filed, the old cannons had been dismantled and the government had erected heavy cannons at the
(continued . . .)

been imposed." *Id.* While dicta, the Court's comment was based on the specific facts of the case, including the fact that "the public has been frightened off the premises by the imminence of the" cannons thereby eliminating the value of the property as a summer resort, its main value to the owner.[9] *Id.* at 328, 43 SCt at 136, 67 LEd 287. However, the Supreme Court did not hold that such facts amounted to a taking, stating instead that the facts *might* support a finding of a taking, but that the issue was a question for the lower court to decide at trial. *Id.* at 330, 43 SCt at 137, 67 LEd 287.

[¶51.] In the instant case, there is no allegation that the firing of shot from a shotgun by hunters is threatened at any and all times, as the cannons fired by the government were in *Portsmouth II*. Nor have Landowners alleged a total deprivation of all potential profits due to the actions of the hunters who act in compliance with SDCL 41-9-1.1(2). The facts in the instant case are more analogous to the facts in *Peabody*, 231 US 530, 34 SCt 159, 58 LEd 351, and *Portsmouth I*, 250 US 1, 39 SCt 399, 63 LEd 809, where the Supreme Court

---

(. . . continued)
       fort as part of the nation's World War I coastal defense system. *Portsmouth II*, 260 US at 335-36, 43 SCt at 139, 67 LEd 287 (Brandeis, J., dissenting).

9.      The Court found that the hotel on the property had previously been profitable, but was conducted at a loss in 1903 and 1904 after the installation of the cannons. *Peabody*, 231 US at 538, 34 SCt at 160, 58 LEd 351. "[S]ince 1904, it had been closed and the cottages had been rented only in part and at reduced rates." *Id.*

concluded the facts were insufficient to demonstrate a permanent physical occupation.[10]

[¶52.]     In the instant case, the hunters who engage in the conduct described in SDCL 41-9-1.1(2) may do so without risking prosecution for a criminal offense, but only during the small game bird hunting season. Only those who meet the requirements of the appropriate license, and have purchased one, come within the scope of this provision. Hunting regulations further limit the hours of shooting activity. Moreover, the shooting is only decriminalized *if* a bird of the types specified in the statute takes flight from or over the right-of-way *and* the hunter is located within the right-of-way.[11] Given the number of limiting factors that must

---

10.    Landowners' reliance on *Citizens for a Safe Grant v. Lone Oak Sportmen's Club, Inc.*, 624 NW2d 796 (MinnApp 2001), and *State v. Wilkinson*, 724 So2d 614 (FlaDistCtApp 1998), is also misplaced. Landowners cite these cases as support for the proposition that shots fired over private property, while intermittent, constitute trespass or invasion of the Landowners' property interest and that such an invasion constitutes a taking within the meaning of *Loretto*. However, in *Citizens for a Safe Grant*, the court held that shots fired over plaintiffs' private property constituted "unlawful entry" by the defendant such that the circuit court did not err when it found the defendant committed the *tort of civil trespass*. 624 NW2d at 805. In *Wilkinson*, the appellate court upheld a criminal conviction for third-degree felony trespass as defined by statute. 724 So2d at 615. The defendant in that case fired a rifle over private property in an effort to illegally shoot and kill a deer, an offense defined by statute as *third-degree criminal trespass*. *Id.* Neither case stands for the proposition that intermittent shooting over private property is of such a magnitude and frequency as to work a taking within the meaning of *Loretto*.

11.    SDCL 41-9-1.1(2) pertains only to small game, and specifically to small game that is able to take flight. SDCL 41-1-1(24) defines small game as:

   "Small game," anatidae, commonly known as swans, geese, brants, merganser, and river and sea ducks; the rallidae, commonly known as rails, coots, and gallinule; the limicolae, referring specifically to shore birds, plover,

(continued . . .)

be present in order for the act of shooting to meet the safe harbor conditions precluding criminal prosecution as provided in SDCL 41-9-1.1(2), the activity as described can occur on an intermittent basis only during the hunting season, and not at all during the other months of the year. Landowners themselves have indicated in their affidavits that the activity does not occur constantly throughout the hunting season. The conduct is therefore temporary in nature during the hunting season, or in the alternative, it is a criminal act outside the protection of the statute.

[¶53.]     Next, Landowners attempt to characterize the shot left laying on their land as further evidence of a permanent occupation. However, the shot pellets that remain on the ground are not fixed structures placed on the land by the hunters or by the State, and therefore do not work a *per se* regulatory physical taking. *See Loretto*, 458 US at 430, 102 SCt at 3173, 73 LEd2d 868 (noting fixed physical structures such as "telegraph and telephone lines, rails, and underground pipes or

---

(. . . continued)

> snipe, and woodcock; the gruidae, commonly known as sandhill crane; the columbidae, commonly known as the mourning dove; the gallinae, commonly known as grouse, prairie chickens, pheasants, partridges, and quail but does not include wild turkeys; cottontail rabbit; and fox, grey and red squirrel. The term includes facsimiles of small game used for law enforcement purposes[.]

> SDCL 41-9-1.1(2) seems to apply to pheasants, grouse, partridge, quail and various waterfowl, but excludes mourning dove. http://www.sdgfp.info/Wildlife/hunting/Index.htm (last visited January 23, 2006). According to GFP, the hunting season for these small game birds runs for specified periods of time beginning the third Saturday in September until the fourth week of January, depending on the type of bird and for some types of birds depending on zone location. http://www.sdgfp.info/Wildlife/hunting/Info/SGSeasons.htm (last visited January 23, 2006).

wires are takings even if they occupy only relatively insubstantial amounts of space and do not seriously interfere with the landowner's use of the rest of his land"). Nor do Landowners establish the shot that may remain prohibits the use of their land for any purpose so as to work a complete loss of its value. Lacking more than intermittent and temporary invasions, or the placement of a fixed structure upon the land by the State, or a complete loss of value of the property to Landowners, there is no legal basis to support a conclusion of law that the State's act in passing SDCL 41-9-1.1(2) or the hunters' actions of firing shot worked a *per se* regulatory physical taking within the meaning of the Fifth Amendment of the United States Constitution and article VI, section 13 of the South Dakota Constitution.

B.      *Penn Central Regulatory Taking*

[¶54.]      The acts of the hunters result in temporary and intermitted physical invasions rather than a permanent occupation. Therefore, we must analyze the takings claim under the *Penn Central* regulatory analysis. *See Lingle*, ___ US at___, 125 SCt at 2081-82, 161 LEd2d 876.

[¶55.]      Under the United States Supreme Court's holding in *Penn Central*, three principal factors must be analyzed in order to determine whether a regulation goes so far as to effect a taking within the meaning of the Fifth Amendment. *Id.* at ___, 125 SCt at 2081-82, 161 LEd2d 876. First, "the character of the governmental action" must be evaluated, keeping in mind that a

> "taking" may more readily be found when the interference with property can be characterized as a physical invasion by government, *see e.g.*, United States v. Causby, 328 US 256, 66 SCt 1062, 90 LEd 1206 (1946), than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good.

*Penn Central*, 438 US at 124, 98 SCt at 2659, 57 LEd2d 631. Next, "the economic impact of the regulation on the claimant" must be examined. *Lingle*, ___ US at ___, 125 SCt at 2081-82, 161 LEd2d 876. Finally, the extent to which the regulation has interfered with "distinct investment-backed expectations" must be analyzed. *Id.* When examining the economic impact and interference with distinct investment-backed expectations, we must do so by examining the alleged interferences with rights in the property as whole. *Penn Central*, 438 US at 130-31, 98 SCt at 2662, 57 LEd2d 631.

[¶56.] Not every destruction or injury to private property by governmental regulation will be a taking within the meaning of the Fifth Amendment. Omnia Commercial Co. v. United States, 261 US 502, 508-510, 43 SCt 437, 438, 67 LEd 773 (1923). "The general rule at least is that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." Pennsylvania Coal Co. v. Mahon, 260 US 393, 415, 43 SCt 158, 159, 67 LEd 322 (1922). The difficulty lies in determining when damage to private property constitutes a compensable "taking," such that justice requires that the burden imposed on the private property owners by the regulation be spread among taxpayers through the payment of compensation.

1. *Character of the Governmental Action*

[¶57.] The character and nature of the state's action is critical in determining whether a taking has occurred. Keystone Bituminous Coal Ass'n. v. DeBenedictis, 480 US 470, 488, 107 SCt 1232, 1243, 94 LEd2d 472 (1987); (citing *Mahon*, 260 US 393, 43 SCt 158, 67 LEd 322). A distinction exists between the character of the

government's actions in situations involving a permanent physical occupation of property and a more temporary invasion or government action outside the owner's property that causes consequential damages within. *Loretto*, 458 US at 428, 102 SCt at 3172, 73 LEd2d 868.

[¶58.] When a regulatory taking is alleged, the examination of the character of the government action includes a determination of whether that action resulted in direct, as opposed to an indirect or consequential, harm to the property. Hansen v. United States, 65 FedCl 76, 106 (FedCl 2005) (citing Ridge Line, Inc. v. United States, 346 F3d 1346, 1355 (FedCir 2003) (citing *Portsmouth II*, 260 US 327, 43 SCt 135, 67 LEd 287)). The causation requirement in *Portsmouth II*, is often referred to as the "natural, probable consequence test." *Id.* (citing *Ridge Line,* 346 F3d at 1355). The test requires proof that the government action is the cause-in-fact of the harm for a taking to be cognizable. *Id.* (citing *Ridge Line*, 346 F3d at 1355).

[¶59.] This cause-in-fact concept was examined in *Griggs v. County of Allegheny*, where homeowners were made physically ill and their home rendered uninhabitable by the noise and vibrations caused by the landings and takeoffs of airplanes at the Allegheny County airport. 369 US at 84, 87, 82 SCt at 531, 533, 7 LEd2d 585. The airport flight path caused airplanes to travel within thirty to 300 feet over the residence on takeoffs, and between fifty-three and 153 feet during landings. *Id.* The county had constructed the airport in compliance with all regulations of the Civil Aeronautics Administration (CAA) that specified the length of airstrips and the clearance required for landings and takeoffs. *Id.* at 85, 82 SCt at 531, 7 LEd2d 585. The county argued that if a taking had occurred it was

effected by the federal government through the CAA's regulations, as the airport was in compliance with those regulations. *Id.* at 89, 82 SCt at 533-34, 7 LEd2d 585. The Court held that the county could not shift the responsibility for the taking to the CAA, as the county had selected the site for the airport and had secured the required properties for the physical construction of runways. *Id.* The Court concluded that it was the actions of the county and not the regulations of the CAA that had worked the taking of an air easement over the homeowners' property. *Id.* The Court noted:

> *The Federal Government takes nothing*; it is the local authority which decides to build an airport vel non, and where it is to be located. We see no difference between its responsibility for the air easements necessary for operation of the airport and its responsibility for the land on which the runways were built.

*Id.* (emphasis added).

[¶60.] Similarly, in *Harms v. City of Sibley*, 702 NW2d 91 (Iowa 2005), the Iowa Supreme Court was called upon to determine if the City of Sibley's rezoning ordinance had worked a taking of private property within the meaning of the Fifth Amendment. In that case, the city rezoned property across the street from the Harms' home from "light industrial" to "heavy industrial" at the request of Joe's Ready Mix. *Id.* at 93. The operation of the cement plant then created intense noise, dust and traffic problems, as well as caused lights to be shone into the Harms' home at all hours of the night. *Id.* at 95. The undisputed facts of the case included that the president and major shareholder of Joe's Ready Mix oversaw all operations of the plant, including selecting the site and how and when the plant would be built and operated. *Id.* at 101. The court cited *Griggs*, 369 US 84, 82 SCt 531, 7 LEd2d 585, and *N. Transp. Co. of Ohio v. City of Chicago*, 99 US 635, 642, 25 LEd 336

(1878), for what it termed the consequential damages rule. *Id.* at 100. The rule is the same as the "natural, probable consequence test," which provides that "in the exercise of governmental powers, and not directly encroaching upon private property, though their consequences may impair its use, are universally held not to be a taking within the meaning of the constitutional provision." *Harms*, 702 NW2d at 100 (quoting *N. Transp. Co. of Ohio*, 99 US at 642, 25 LEd 336). The court noted that *Griggs* employed the same "natural, probable consequence test" used in *N. Transp. Co. of Ohio*, which requires that the government action be the cause-in-fact of the damage "as opposed to an indirect or consequential, appropriation or seizure of property." *Id.* (quoting *N. Transp. Co of Ohio*, 99 US 642, 25 LEd 336) (citing Barbian v. Panagis, 694 F2d 476, 485-87 (7thCir 1982); *Hansen,* 65 FedCl at 102-06)). The court held that the actions of Joe's Ready Mix resulted in the damage to the homeowners' property rights by creating a nuisance, and therefore there was no taking by the City of Sibley when it rezoned the property in question. *Id.* at 101. Instead, the homeowners were permitted to recover damages in nuisance from Joe's Ready Mix. *Id.*

[¶61.] While we have never had occasion to consider the "natural, probable consequence test" in the context of a regulatory takings claim, we are persuaded that the cause-in-fact of the harm must be examined when analyzing the nature or character of the government action that is alleged to have worked a taking. *See Hansen*, 65 FedCl at 102-06 (discussing the concept of consequential harm in tort law and its application in takings claims). In doing so, we must identify the specific harm to property incurred by Landowners, and whether the actions that caused the

harm were those of the State or some other entity or person not under the direct authority or control of the State.

[¶62.] The damage complained of by Landowners is the intrusion of shot onto their land and over the airspace above their land, as directed by hunters who shoot game birds that have taken flight from the rights-of-way. Landowners argue that the actions of the hunters have been caused by the enactment of SDCL 41-9-1.1(2).[12] The specific conduct complained of by Landowners in their affidavit includes the following:

---

12. SDCL 41-9-1.1, which defines the parameters of criminal trespass while road hunting, provides:
    Except for controlled access facilities as defined in § 31-8-1, interstate highways, unimproved section lines not commonly used as public rights-of-way, and highways within parks or recreation areas or within or adjoining public shooting areas or game refuges posted for restriction of an applicable use as hereinafter set forth by the Department of Game, Fish and Parks, § 41-9-1 does not apply to fishing, trapping, or hunting on highways or other public rights-of-way within this state that meet the requirements of § 41-9-1.3. For purposes of this section, hunting on highways or other public rights-of-way includes:

      (1) The shooting at or taking by legal methods of small game, except mourning dove, that are located within the boundaries of the highway or public right-of-way;

      (2) The shooting at or taking by legal methods of small game, except mourning dove, that are in flight over private land if the small game has either originated from or has taken flight from the highway or public right-of-way or if the small game is in the process of flying over the highway or public right-of-way.

    If subdivision (2) of this section is declared by an advisory opinion or adjudication of the South Dakota Supreme Court to be a taking of private property requiring compensation, subdivision (2) is void.

(continued . . .)

17. We observed numerous hunters shooting onto our property from [public highways] throughout the four to five weeks [following the opening of hunting season].
18. This season, after the change in road hunting law implementing SDCL 41-9-1.1(2), the behavior of those hunting from the roads has been bolder and more aggressive.
19. We observed some hunters shooting at pheasants on or above our property that had not taken flight from or crossed the road.
20. We observed hunters shooting within the 660-foot safety zone provided by SDCL 41-9-1.1, including within 660 feet of our home, buildings, and cattle.
21. We observed hunters trespassing on our land and, when confronted, they ordered us off of our own property.

[¶63.]     The "damage" to Landowners' property, that is the intrusion of shot

onto their lands and shot left on their lands, is caused by the actions of hunters.

However, the statute does not specifically encourage or mandate that road hunting

be conducted in a manner that causes shots to be fired onto Landowners' property.

The hunters at all times retain control over when, where and how they will fire at

_____
(. . . continued)
No person, except the adjoining landowner or any person receiving written permission from the adjoining landowner, may use such highways or rights-of-way for the purposes of hunting defined in this title within a six hundred sixty-foot safety zone surrounding an occupied dwelling, a church, schoolhouse, or livestock. Neither the person discharging a firearm at small game nor the small game being shot at may be within the safety zone. No person, except the adjoining landowner or any person receiving written permission from the adjoining landowner, may use such highways or rights-of-way for the purpose of trapping within six hundred sixty feet of an occupied dwelling, church, or schoolhouse. A violation of this section is a Class 2 misdemeanor. If any person is convicted of knowingly discharging a firearm within six hundred sixty feet of any occupied dwelling, church, or schoolhouse for which such distance has been clearly and accurately marked and posted, the court shall, in addition to any other penalty, revoke the person's hunting privileges for a period of one year from the date of conviction.

game birds flying over the right-of-way. Any damage caused to private property by the actions of hunters cannot be attributed to the State. The State does not place the hunter in the right-of-way or pull the trigger. Instead, any damage to property is attributable only to the acts of the hunters themselves as was the case for Joe's Ready Mix in *Harms v. City of Sibley*. The holding in *Griggs* supports this proposition as it is the hunters, like the county of Alleghany, that took action in compliance with all pertinent regulations yet was the direct cause of any harm to Landowners' property. Thus, any harm complained of by Landowners was not legally caused by the legislative enactment, but rather by the particular conduct of the hunters.[13]

---

13. The circuit court, however, accepted the Landowners' argument that the enactment of SDCL 41-9-1.1(2) was not merely a decriminalization of the act of firing onto private property while road hunting, but rather, based on the 2003 Hunting Handbook of the South Dakota GFP, constituted a compensable taking. In doing so, the circuit court was both legally and factually incorrect.

   The 2003 Hunting Handbook is simply a guide to hunters published by GFP. It does not purport to enact law as it notes in its opening page, "The Hunting Handbook is a synopsis of South Dakota Codified Laws and Game and Fish and Parks rules." State of South Dakota, Hunting Handbook 5 (2003). What actually constitutes the law in this state is set forth in SDCL 1-1-23, which provides:

   The will of the sovereign power is expressed:
   (1)     By the Constitution of the United States;
   (2)     By treaties made under the authority of the United States;
   (3)     By statutes enacted by the Congress of the United States;
   (4)     By the Constitution of this state;
   (5)     By statutes enacted by the Legislature;
   (6)     By statutes enacted by vote of the voters;
   (7)     By the ordinances of authorized subordinate bodies;

   (continued . . .)

[¶64.]    Furthermore, while SDCL 41-9-1.1(2) decriminalizes the shooting at

small game birds originating from or taking flight over a right-of-way, when read in

conjunction with SDCL 41-9-8 and 41-9-9, landowners retain all civil remedies

against hunters that physically enter and shoot over their land.[14]  SDCL 41-9-1.1(2)

_____

(. . . continued)

> (8)    Rules of practice and procedure prescribed by courts or adopted by
> departments, commissions, boards, officers of the state, or its
> subdivisions pursuant to authority so to do.

SDCL 1-1-23 does not include such "synopses" or handbooks.

Factually the handbook section on "Hunting on Public Road Rights-of-Way"
nowhere mentions that a hunter has the full legal right to fire over private
property.  State of South Dakota, Hunting Handbook 26 (2003).  In fact at
page forty, the handbook informs the landowner "How to Prosecute a
Trespasser."  *Id.* at 40.  The phrase relied upon by the circuit court, "[t]o be
lawfully taken from a public road right-of-way, the hunter must be within the
right-of-way boundaries when shooting, and the game must originate from or
be flying over the road right-of-way" is found in the section dealing with
"Unarmed Retrieval" not "Road Hunting."  *Id.* at 33.  However, Landowners
have not challenged the status of unarmed retrieval of birds shot over the
right-of-way, which is the subject of that particular sentence.

Neither has the Legislature seen fit to delegate sole regulatory authority over
section line highways to GFP.  The construction, repair and maintenance of
these roads are the responsibility of the board of township supervisors.
SDCL 31-13-1.  Relocation or vacation of a section-line highway is granted to
the county commissioners or the board of supervisors of an organized
township under appropriate circumstances.  SDCL 31-18-3.

14.    In its amici brief, the South Dakota Wildlife Federation sets forth what it
believed to be a catalogue of those civil remedies.  It stated:

> Here, the Plaintiffs retain their right to bring an action in
> Ejectment, SDCL 21-3-6, the traditional method for redeeming
> property interests against interlopers.  This action may be for
> damages as well as for recovery of title.  Where force is used, a
> plaintiff in Ejectment may recover treble damages.  SDCL 15-3-
> 1.  The common law action of Private Nuisance is available to
> protect Plaintiffs in their use and enjoyment of property.  SDCL

(continued . . .)

describes the manner in which game may be taken without violating the *criminal law* of the State of South Dakota and incurring prosecution for a Class 2 Misdemeanor.  The enactment of SDCL 41-9-1.1(2) decriminalizes the conduct for which the defendant was convicted in *Rumpca*, 2002 SD 124, 652 NW2d 795.  It does not, however, eliminate any civil remedies available to landowners when a hunter engages in conduct that amounts to a civil trespass.

[¶65.]        This type of legislative action is not unprecedented.  We have in many instances recognized that the Legislature has the statutory authority to decriminalize an act while retaining civil liability upon the person who commits the act.  The writing of an insufficient funds check in South Dakota can lead to criminal prosecution under SDCL 22-41-1 and civil liability under SDCL 22-2-1.  Yet, since 1973, the Legislature has seen fit to preclude criminal liability of the perpetrator in numerous instances:  *i.e.*, post-dated checks under SDCL 22-41-2.2, failure of victim to serve notice of dishonor upon writer of insufficient funds check per SDCL 22-41-3.1, and failure to prosecute within six months of notice of check's dishonor as required by SDCL 22-41-3.4.  However, should the victim fail to comply

_____

(. . . continued)
            21-10-1, -3.  Plaintiffs also retain the right to protect their
            property through Trespass both as a civil tort, and as a
            misdemeanor, SDCL 22-35-6.  Injunction is available in
            appropriate cases.  SDCL 21-8-1.  In other words, *all* classical
            common law and statutory remedies for assertion of rights in
            private property remain intact.  That being so, the essential
            element of all takings jurisprudence is lacking in this case - an
            action by government which deprives landowners of title.

        Amicus Curiae South Dakota Wildlife Federation's Br. 3.

with these analogous requirements that preclude a criminal prosecution, he or she still retains full civil remedies under SDCL 22-2-1.

[¶66.]    Another example is marital relations.  South Dakota at one time made adultery a crime.  *See* SDCL 22-22-17 and -18 (repealed by SL 1976, ch 158, § 22-8).  These statutes were repealed in 1976.  Yet, since 1877 we have also recognized a civil cause of action for alienation of affections.  SDCL 20-9-7.  In *Veeder v. Kennedy*, 1999 SD 23, 589 NW2d 610, we upheld the continued civil cause of action as its statutory basis was still in force despite the fact the criminal liability had long since been repealed.

[¶67.]    The Legislature has also done the reverse.  In the passage of SDCL 35-4-78, it made the sale of an alcoholic beverage to a person under the age of twenty-one a crime yet also stated there would be no civil liability against the seller for the same act.  In *Wegleitner*, 1998 SD 88, 582 NW2d 688, we upheld this statutory distinction from dual constitutional attacks under the separation of powers and the open courts provision in article VI, section 20 of the South Dakota Constitution.

[¶68.]    Here, SDCL 41-9-9 goes one step further in making sure it is understood that landowners retain their civil remedies by declaring:

> Any person who is engaged, *legally or illegally,* in hunting is liable for any injury or death to any person or damages to property caused by the hunter's negligent actions.  The injured person or the owner of the property that has been damaged may recover civil damages.  *Nothing herein shall abrogate any other provision of law.*

(emphasis added).

[¶69.]    The Legislature has also retained criminal statutes that are relevant to this case.  Bensons state that they have experienced shot hitting their home and

nearby tin shed. Messmers have observed hunters shooting around their home, buildings and cattle. Hunters who engage in such criminal conduct are not protected by SDCL 41-9-1.1(2). Such acts are still a violation of the criminal law under another portion of SDCL 41-9-1.1 that provides in relevant part:

> No person, except the adjoining landowner or any person receiving written permission from the adjoining landowner, may use such highways or rights-of-way for the purposes of hunting defined in this title within a six hundred sixty-foot safety zone surrounding an occupied dwelling, a church, schoolhouse or livestock…. A violation of this section is a Class 2 misdemeanor.

[¶70.] Next, we have been invited by the Landowners to focus on the perceived "purpose and effect" of SDCL 41-9-1.1(2). Landowners attempt to persuade this Court to focus on the actions of hunters and the records of legislative debates to show that the true purpose and intent of SDCL 41-9-1.1(2) is an expansion of the right-of-way easement created on section lines and public highways to include an easement for hunting on private lands.

[¶71.] As we have noted on many occasions:

> The purpose of statutory construction is to discover the true intention of the law which is to be ascertained primarily from the language expressed in the statute. The intent of a statute is determined from what the legislature said, rather than what the courts think it should have said, and the court must confine itself to the language used. Words and phrases in a statute must be given their plain meaning and effect. When the language in a statute is clear, certain and unambiguous, there is no reason for construction, and the Court's only function is to declare the meaning of the statute as clearly expressed. Since statutes must be construed according to their intent, the intent must be determined from the statute as a whole, as well as enactments relating to the same subject. But, in construing statutes together it is presumed that the legislature did not intend an absurd or unreasonable result. When the question is which of two enactments the legislature intended to apply to a particular situation, terms of a statute relating to a particular

-41-

> subject will prevail over the general terms of another statute.
> Moss v. Guttormson, 1996 SD 76, ¶10, 551 NW2d 14, 17 (citing
> U.S. West Communications, Inc. v. Public Util. Comm'n, 505
> NW2d 115, 122-23 (SD1993)) (citations omitted).

Martinmaas v. Engelmann, 2000 SD 85, ¶49, 612 NW2d 600, 611.

[¶72.]      In the instant case, we may not resort to these external resources to interpret the statute, as the words of SDCL 41-9-1.1(2) are "clear, certain and unambiguous." Again, we are reminded that legislative intent is determined from what the Legislature said, not what we think it said or others think it said. *Martinmaas*, 2000 SD 85 ¶49, 612 NW2d at 611.[15] To do otherwise is to engage in a form of judicial legislating, a power that is not granted to us under the constitution and circumvents the role of the Legislature where that power rests. This we cannot and will not do.

[¶73.]      Despite the lack of ambiguity within SDCL 41-9-1.1(2), Landowners next point to a theoretical situation that might result when landowners attempt to press civil charges against a hunter who fires onto their property at a game bird that has taken flight from the right-of-way. Landowners hypothesize that the hunter will be able to use SDCL 41-9-1.1(2) as a defense against a claim of civil

---

15.    Landowners cite two statements made during the floor debate of SDCL 41-9-1.1(2) for the proposition that it was intended to go beyond decriminalization and was in reality intended to strip landowners of any remedy for firing at game flying over their land. We have consistently held that statements of individual legislators are not persuasive to establish the intent of the Legislature for a particular statute. Cummings v. Mickelson, 495 NW2d 493, 499 n7 (SD 1993) (citing State ex rel. Cooperative Wool Growers v. Bushfield, 69 SD 172, 176, 8 NW2d 1, 3 (1943)). There are 105 legislators and there may be 105 different individual reasons they vote for or against a bill. Rather, our rule of construction is that the Legislature said what it meant

(continued . . .)

trespass, as the conduct has been "legalized" by the statute. However, as noted above, the fact that an act is not a crime does not immunize it from civil liability. If this were so, an individual sued for alienation of affection under SDCL 20-9-7 could simply plead as a defense that adultery is no longer a criminal offense in South Dakota. While the statement that adultery is not a crime under South Dakota law is true, it does not preclude a spouse from suing a third party for alienation of affection. *See Veeder*, 1999 SD 23, 589 NW2d 610. The criminality of adultery is not determinative of the civil remedy when the rights of personal relation are infringed upon by the "enticement of a husband from his wife or of a parent from a child." *See* SDCL 20-9-7.

[¶74.] Similarly, the elements of the tort of civil trespass remain unaffected by SDCL 41-9-1.1(2), and require only that:

> One who intentionally and without a consensual or other privilege
> (a) enters land in possession of another or any part thereof or causes a thing or third person so to do, or
> (b) remains thereon is liable as a trespasser to the other irrespective of whether harm is thereby caused to any of his legally protected interests.

*Rumpca*, 2002 SD 124, ¶10 n2, 652 NW2d at 798 (citing Restatement (Second) of Torts § 158). The language used to decriminalize the formerly proscribed conduct does not serve to create civil consent, a civil privilege, or a civil defense for game bird hunters during hunting season, or any other time of the year.

---

(. . . continued)

and meant what it said from the text of the statute. *In re* Famous Brands, Inc., 347 NW2d 882, 885 (SD 1984).

### 2. & 3. *Economic Impact of Regulation on Claimants and Interference with Distinct Investment Backed Expectations*

[¶75.]        Under the second and third factors in *Penn Central*, Landowners advance only two specific complaints with regard to the adverse economic impact and interference with distinct investment-backed expectations they have incurred as a result of the passage of SDCL 41-9-1.1(2). According to the complaint, Landowners allege that "SDCL 41-9-1.1(2) denies them valuable hunting and fishing rights appurtenant to and separable from their property as provided by" SDCL 43-13-1 and 43-13-2.[16] Messmers support the claim of adverse economic impact by stating: "Because road hunting, as recently redefined by SDCL 41-9-1.1(2), now includes the shooting of pheasants on or above our land, members of the public shoot onto our property at the expense of the quality of our private hunting business and the income we derive from that business."

[¶76.]        However, it is critical to note, that per the provisions of SDCL 41-1-2,

> No person shall at any time or in any manner acquire any property in, or subject to his dominion or control, any game bird, game animal, or game fish, or any part thereof, but they shall always and under all circumstances be and remain the property of the state, except as provided by § 41-1-3.

---

16.    SDCL 43-13-1 provides in relevant part:

The following land burdens, or servitudes upon land, may be granted and held, though not attached to land:
(1)    The right to pasture, and of fishing and taking game[.]

SDCL 43-13-2 provides in relevant part:

The following land burdens or servitudes upon land may be attached to other land as incidents or appurtenances, and are called easements:

(3)    The right of taking game[.]

Thus, the only manner in which a person may obtain personal property rights in a wild game bird, animal or fish, is by the lawful taking of the game in compliance with all pertinent hunting and fishing laws. SDCL 41-1-2. Landowners have no property rights in the game that takes refuge, or otherwise locates on their property, until such time as the landowners take the game in compliance with all pertinent hunting regulations. *Reis*, 1996 SD 75, ¶29, 550 NW2d at 84 (Gilbertson, J., concurring).

[¶77.] The United States Supreme Court has recognized "that government may execute laws or programs that adversely affect recognized economic values." *Penn Central*, 438 US at 124, 98 SCt at 2659, 57 LEd2d 631. A challenged government action that causes economic harm will not support a takings claim when the action does not interfere with "interests that were sufficiently bound up with the reasonable expectations of the claimant to constitute 'property' for Fifth Amendment purposes." *Id.* (citing United States v. Willow River Power Co., 324 US 499, 65 SCt 761, 89 LEd 1101 (1945) ("interest in high-water level of river for runoff for tailwaters to maintain power head is not property"); United States v. Chandler-Dunbar Water Power Co., 229 US 53, 33 SCt 667, 57 LEd 1063 (1913) ("no property interest can exist in navigable waters")) (citations omitted).

[¶78.] Landowners argue that SDCL 41-9-1.1(2) interferes with their right to grant servitudes and easements for hunting under SDCL 43-13-1. Landowners seem to suggest that the State should be held liable for any decrease in the value of such servitudes that accrues due to a decrease in the number of publicly owned game birds that happen to be located upon Landowners' property.

[¶79.] SDCL 41-9-1.1(2) does not limit the right of Landowners to grant such easements and servitudes. While SDCL 41-9-1.1(2) may affect the quantity of game that may be available within the State and particularly on public rights-of-way, the State has the undisputed right to regulate its wildlife as it is property of the State until lawfully taken by a hunter. *See* SDCL 41-1-2 and -3. The State is the custodian of wildlife, and allocates state resources to GFPs' efforts to manage game birds that are deemed of public value. SDCL 41-3-1. The State does not guarantee the quantity and quality of game birds. Nor does it guarantee that those who hunt will actually take sufficient game to satisfy their pecuniary needs or their daily hunting limit. The State cannot be forced by the courts to manage its wildlife in a manner that guarantees sufficient game to maintain, augment or decrease the value of Landowners' servitudes or easements. A decrease in value of these servitudes and easements due to a decrease in the publicly owned game bird population in a particular locale is our free market system at work. The State is not a guarantor of property values.

[¶80.] In their complaint, Landowners Messmers state they own and operate a private hunting lodge and maintain private hunting grounds on their property. Messmers note they have devoted sixty-five acres of the 3,000 acres of land they farm exclusively to food plots and habitat for pheasants. Messmers also claim that the only income derived from these sixty-five acres of land comes from their private hunting business. Messmers acknowledge that many of their neighbors farm their land differently and do not devote land exclusively for pheasant habitat.

[¶81.]	When examining the economic impact of the contested regulation and its alleged interference with distinct investment-backed expectations, the court must determine how and to what extent the acts in question have adversely impacted the economic value of the land.  *Penn Central*, 438 US at 130-32, 98 SCt at 2662-63, 57 LEd2d 631.  In doing so, the land is viewed as one complete parcel rather than dividing the "single parcel into discrete segments and attempt[ing] to determine whether rights in a particular segment have been entirely abrogated." *Id.* at 130-31, 98 SCt at 2662-63, 57 LEd2d 631.  Viewed from this perspective, Landowners retain the full value of the land whether it is devoted to pheasant habitat or conventional farming.

[¶82.]	The enactment of SDCL 41-9-1.1(2) does not prohibit Landowners from devoting any portion of their land to pheasant habitat or other income producing venture.  But as noted above, the State is not a guarantor of the game bird population in a particular locale.  Therefore, a takings claim that relies on a decrease in profitability of a privately owned business due to the taking of publicly owned birds by road hunters must fail under this portion of the balancing analysis.

[¶83.]	Finally, even if Landowners were able to establish economic losses or a bona fide injury to distinct investment-backed expectations, a taking by the State would still not have occurred.  It is the actions of the hunters that would be the cause of losses, as it is the intrusion of shot onto Landowners' property and shot left

#23492

on their lands, and not the legislative enactment of SDCL 41-9-1.1(2), that is the legal cause of any injury incurred by Landowners.  *See supra* ¶¶61-63.[17]

## Conclusion

[¶84.]	An examination of the history of our hunting statutes in *Reis*, 1996 SD 75, ¶¶28-31, 550 NW2d at 84-85, (Gilbertson, J., concurring), shows that for a great part of our history there were no, or only limited, criminal restrictions upon hunting.  If the passage of SDCL 41-9-1.1(2) constitutes a compensable taking, then the same legal situation existed from 1889 and for many years thereafter.  During those decades there were no criminal penalties for firing at a pheasant that was flying over private land.  Yet, one can search all the Constitutional Debates and our case law prior thereto and after 1889 and there is no hint or suggestion a taking was the state of the law.  "[T]he Constitution was written and adopted in the light of the conditions and well known laws as they then existed...."  *Wegleitner*, 1998 SD 88, ¶31, 582 NW2d at 698 (citations omitted).  Although the hunting statutes have been repeatedly revised and amended since 1899, the relevant portion of article VI, section 13 of our state constitution remains the same as it did when enacted in 1889.

[¶85.]	Moreover, if these Landowners can successfully advance a takings claim here, any citizen or group thereof who can establish a monetary loss will be

---

17.	Landowners' complaint does not allege a direct violation of the Privileges and Immunities Clause.  However, any claim by Landowners that the State has deprived them of "rights, privileges or immunities secured by the Constitution and laws and [defendants] are liable therefore under 42 USC 1983," is a part of their central claim of an uncompensated taking.  Because we hold no taking exists, all such subsidiary claims also fail.

looking to the public treasury for compensation should the Legislature deem the cause of action not to be appropriate for criminal sanctions, let alone remove one. Such a rationale was rejected in *Wegleitner.* "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law." *Penn Central*, 438 US at 124, 98 SCt at 2659, 57 LEd2d 631 (quoting *Mahon*, 260 US at 413, 43 SCt at 159, 67 LEd at 322).

[¶86.]        Reduced to its core, Landowners' argument is that the State faces two options:  it must for the first time in its history be compelled by the constitution to declare an act to be in violation of a criminal law or in the alternative pay Landowners for its refusal to do so.  Landowners cite no case law to support this argument and we have been unable to find any court which has so held.  This argument improperly attempts to shift the resolution of the issue from the legislative arena to that of this Court.  While the Legislature certainly enjoys the legal authority to once again make this type of activity criminal in nature, there is nothing in our Constitution to compel it.  To hold otherwise would be to rule that compensable takings have been ongoing since 1889, except for that short period of time when the Legislature chose to criminalize the conduct as described in SDCL 41-9-1.1(2).

> Although many members of the Constitutional convention were to become Legislators in the new State of South Dakota, the early State Legislatures felt no constitutional compulsion to strike down or even modify [the unlimited right to hunt].  Green [v. Siegel, Barnett, & Schutz], 1996 SD 146, ¶18, 557 NW2d [396,] 402.

*Wegleitner*, 1998 SD 88, ¶11 n3, 582 NW2d at 692.

[¶87.] Furthermore, any civil remedies that existed prior to the passage of SDCL 41-9-1.1(2) remain intact. In fact, Landowners cite to no legislative roll-back of any civil causes of action that have existed for the protection of their property rights. At all times immediately prior to, and after this Court's holding in *Rumpca*, 2002 SD 124, 652 NW2d 795, and the legislative reaction to it by the amendment of SDCL 41-9-1.1(2), landowners' civil remedies against hunters remained the same.

[¶88.] Were we to affirm the circuit court and conclude a compensable taking has occurred here, the question would then arise as to what property rights the State has acquired by its inverse condemnation and compensation payments to the Landowners, for this "is ultimately a judicial question." *See Illinois Central R.R. Co.*, 33 SD at 77, 144 NW at 728 (quoting Hairston v. Danville & WR Co., 208 US 598, 28 SCt 331, 52 LEd 637 (1908)). Although SDCL 41-9-1.1(2) is explicitly restrictive, the constitution that mandates the compensation requirement for a taking also guarantees "public use" in exchange. Under the "use by the public" doctrine as set forth in *Illinois Central,* we would have to decide whether the public now has purchased and enjoys the right to enter and hunt in the affected realty, not just shoot over it. *See also Frawley Ranches*, 270 NW2d at 369. "The right-of-way is public if everyone who desires may lawfully use the right-of-way." *Id.* at 369. This is a theoretical question which need not be answered, as we hold there is no compensable taking to begin with under the facts of this case.

[¶89.] "While the wisdom of the current statutes may be justly debatable, there is nothing contained in [the constitution] to topple them." *Wegleitner*, 1998

SD 88, ¶35, 582 NW2d at 699. For the above reasons we reverse the holding of the circuit court on Issue 3.

**[¶90.]        ZINTER, Justice, and JOHNSON, Circuit Judge, concur.**

**[¶91.]        KONENKAMP, Justice, concurs in result.**

**[¶92.]        MEIERHENRY, Justice, dissents.**

KONENKAMP, Justice (concurring in result).

[¶93.]        Although I agree that there has been no actual taking of private property here, this case approaches the limits of regulatory encroachment. In amending its rules on road hunting, the Legislature struck a difficult balance between the interests of hunters and landowners, a balance that falls within constitutional limits. Indeed, as the United States Supreme Court recognized, these questions have "proved to be a problem of considerable difficulty." *Penn Central*, 438 US 104, 123, 98 SCt 2646, 2659, 57 LEd2d 631. Here, the difficulty has been overcome by a careful balancing of equities. If hunters obey all existing laws governing road hunting, then the interference to landowners from shooting over private property at wild game in flight from or across a public road will be minimal.

[¶94.]        Nonetheless, to say that there is no taking here because the State is only "decriminalizing" a certain hunting provision is to ignore the State's comprehensive regulatory system controlling every aspect of hunting. By making an exception to the general prohibition in SDCL 41-9-1 against hunting on private property without owner consent, the Legislature has itself effectively granted consent to hunters to shoot over private property as if it were in the public domain. No other conclusion can be gained from a plain reading of the statute. It provides in

relevant part that lawful "hunting on highways or other public rights-of-way includes . . . (2) [t]he shooting at or taking by legal methods of small game, except mourning dove, that are in flight *over private land* if the small game has either originated from or has taken flight from the highway or public right-of-way or if the small game is in the process of flying over the highway or public right-of-way." SDCL 41-9-1.1(2) (emphasis added).

[¶95.] A contrary conclusion reached by the Court that the statute does not encourage shooting over private property is simply incorrect. Legislative consent now legitimizes the shooting at certain small game that are in flight a short distance within private property boundaries. The fact that hunters must be licensed by the State and be hunting during the lawful season set by the State before they can shoot over private property only fortifies this conclusion. Saying that landowners still maintain their civil remedies and that they may protect themselves against trespass by suing road hunters cannot mollify the State's part in consenting to road hunting on private property.

[¶96.] Despite these concerns, however, the Legislature is entitled to balance the benefits and burdens here without being responsible for a taking under eminent domain. The huge benefit the State obtains through tourism and recreational hunting outweighs any transient and marginal interference to landed interests caused by road hunters who are otherwise obeying all state hunting laws.[18] As the

---

18. An illustration of how little loss the Landowners can show here is evident in the examples of hunter violations they assert to support their claim. Many of the examples they offer, like firing near homes or livestock, shooting at birds

(continued . . .)

United States Supreme Court, wrote, "'Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law,' . . . and this Court has accordingly recognized, in a wide variety of contexts, that government may execute laws or programs that adversely affect recognized economic values. " *Penn Central*, 438 US at 124, 98 SCt at 2659, 57 LEd2d 631 (quoting *Mahon*, 260 US at 413, 43 SCt at 159, 67 LEd 322).

[¶97.]        I cannot agree with the Landowners' argument that they have suffered a permanent taking of their property to the extent of 900 feet on the other side of their fence lines.  Compensating landowners for a permanent taking of their property is untenable because the State has not *permanently* occupied any property by its change in hunting laws.  At worst, the interference here is episodic and seasonal.  The thought of sending a state compensation check to a landowner each time some bird shot crosses a property line seems excessive.  Any property damage that might be caused in general by shooting at birds in flight is speculative.  The land suffers no diminution in value, and it retains all its legitimate economic productivity.  *Penn Central*, 438 US at 124-25, 98 SCt at 2659, 57 LEd2d 631.

[¶98.]        Nonetheless, what is worrisome about the Court's decision today is its rationale.  It reasons that private property can be opened to public use through the expedient of "decriminalizing" the very laws that protect private property.  This ignores an essential function of our constitutional form of government.  James

---

(. . . continued)
        that are not in flight from or across a road, and trespassing while armed, remain criminal violations of existing law.

Madison, the author of the private property clause in the Fifth Amendment, wrote, "A Government is instituted to protect property of every sort. . . . This being the end of government, that alone is a just government, which impartially secures to every man, whatever is his own." Ralph Ketcham, *James Madison: A Biography*, 330 (Univ of Virginia Press 1990).

[¶99.] We need not imagine too vigorously in order to capture the flaw in the Court's logic. What other offenses might be "decriminalized" to promote public use of private land? This "decriminalization" rationale is unnecessary to reach the conclusion that there is no taking of property here under our state and federal constitutions. We should go no further than to decide, under the Supreme Court's well-established balancing of interests test, that shooting over private property at wild game in flight from or across a public road is a minimal intrusion and therefore is not compensable. *Penn Central*, 438 US at 136-37, 98 SCt at 2665-66, 57 LEd2d 631.

[¶100.] Finally, for those who might hold greater designs on private property for public recreational uses, they would do well not to be emboldened by today's ruling. The Court's rationale is questionable and not likely to withstand keener constitutional scrutiny in future cases.

[¶101.] Accordingly, I concur only in the result on Issue 3.

MEIERHENRY, Justice, dissenting on Issue 3.

[¶102.] I respectfully dissent from the majority's conclusion that SDCL 41-9-1.1(2) is not a taking for which just compensation is due. I agree with the circuit

court's determination that this statutory provision results in a physical invasion of Landowners' properties. As the circuit court recognized, the "right to exclude others is one of the most essential sticks in the bundle of rights that are commonly characterized as property."

[¶103.] My fundamental disagreement with the majority centers on the interpretation of the statute. I would conclude that the Legislature intended to extend the road hunting easement to include shooting at birds over private land. The extension of the easement took away Landowners' legal right to exclude road hunters from shooting over and entering certain portions of their property. Under this interpretation, the statute is a taking without just compensation.

[¶104.] Under the majority's interpretation, the Legislature's only intent was to decriminalize shooting at birds over private land. According to the majority, the Legislature left intact all of a property owner's legal rights to exclude others from entering or shooting over the land. This interpretation gives the amendment little if any meaning in regard to road hunting. It just means that criminal sanctions will not be imposed by GFP. It also means that the property owners have the absolute right to deny any entry upon their land. Consequently, the property owner may have actually gained an advantage. The culprits now are the road hunters who invade the land without permission. Conceivably the holding of the majority would also apply to the unarmed retrieval statute. The unarmed retrieval statute provides:

> Unarmed retrieval of lawfully taken small game from either private land or land controlled by the Department of Game, Fish and Parks or other public lands, *is not a crime or petty offense*, if

> the retrieval of the small game does not involve the use of a motor vehicle.

SDCL 41-9-8 (emphasis added).  Since property owners retain all rights to exclude others from their land, they would also have the right to deny unarmed retrieval of birds legally shot from the roadway because, like SDCL 41-9-1.1(2), the unarmed retrieval statute "decriminalizes," rather than authorizes, retrieval.

[¶105.]    There is no doubt that the days of private property owners giving strangers permission to hunt without charge have all but disappeared.  Property owners, instead, have transformed hunting into an industry that serves to supplement their farm income.  They have turned their farmland into commercial hunting preserves.  Investment in hunting preserves involves land and crop management specifically designed to complement game preservation and hunting rather than crop yield.  Hunting preserve owners must obtain a state permit, pay an annual license fee, and abide by GFP regulations.  SDCL 41-10-2; SDCL 41-10-4; *see generally* SDCL ch. 41-10.  In addition, preserve owners must purchase and release large numbers of domestically raised birds to augment the native hatch.  ARSD 41:09:01:02 (requiring preserves to release and maintain at least 600 male pheasants).  The resulting abundance of birds in and around the preserves naturally attracts road hunters.  Today's opinion, however, appears to diminish the range of road hunting since the road hunters have no right to shoot over private property or gain entry without the property owners' authorization.

[¶106.]    Thus, unauthorized road hunters could face civil liability.  The majority leaves open all civil remedies to the property owners' creativity and devices.  Is this what the Legislature really intended by the amendment?  Did the

Legislature envision property owners clearly posting their land with warnings that any and all trespass is prohibited and that violators would be civilly liable? Was the expectation that hunters who shoot birds over private land could find themselves liable for damages, perhaps at least in amounts similar to or more than what they would have paid had they been paying guests? If so, GFP needs to update its hunting manual to alert road hunters of their potential civil liability whenever they breach private land and airspace by gunshot or physical entry.

[¶107.]		I cannot agree that this is what the Legislature intended. It is more likely that the Legislature intended to expand the definition of road hunting to include shooting over "private land." The intent can be determined from the plain and ordinary meaning of the language of the statute. The precise statutory language defines "hunting on highways or other public rights-of-way" as including:

>	(1)	The shooting at or taking by legal methods of small game, except mourning dove, that are located within the boundaries of the highway or public right-of-way;
>	(2)	*The shooting at or taking by legal methods* of small game, except mourning dove, *that are in flight over private land if the small game has either originated from or has taken flight from the highway or public right-of-way or if the small game is in the process of flying over the highway or public right-of-way.*

SDCL 41-9-1.1 (emphasis added). The statute authorizes members of the public who are hunting on public highways or rights-of-way to fire at birds that either fly up in rights-of-way or merely fly over rights-of-way, but continue in flight over private land. Thus, the meaning is clear.

[¶108.]		But if there is some ambiguity, the circumstances surrounding the 2003 amendment of SDCL 41-9-1.1 support this interpretation. First, the change in

the definition of "hunting on public rights-of-way" was intended to abrogate our decision in *State v. Rumpca* so as to allow the public to shoot birds over private property. *See* 2002 SD 124, 652 NW2d 795. Dissatisfied with the limits on road hunting enunciated in *Rumpca*, hunters and the organizations representing them turned to the Legislature with demands for more available public hunting. The State can—and does—establish publicly owned parcels of land on which its citizens may hunt. In comparison with other states, however, South Dakota maintains very little public hunting land. *See* Vincent Michael Roche, Road Hunting Shot Down: Reflecting on the South Dakota Supreme Court's Decision in *State v. Rumpca*, 7 Great Plains Nat. Resources J. 31, 37 (2003). Instead of purchasing more public land to address the demand, the Legislature expanded the public easement to reach beyond the roadway, over the property line, and onto the individual property owner's land.

[¶109.]     Although we have not traditionally relied on legislative floor debates in determining legislative intent, it is interesting to note that nowhere in the debates was the subject of decriminalization mentioned. *See* Debates Concerning HB 1163, 2003 Legislative Session, *available at* http://legis.state.sd.us/sessions/2003/ 1163.htm (last visited January 23, 2006). Further, if the Legislature intended to merely affirm the private property owners' right to exclude road hunters altogether, why did the Legislature provide for automatic repeal if the statute was found to be a taking? The automatic repeal provides: "If [SDCL 41-9-1.1(2)] is declared by an advisory opinion or adjudication of the South Dakota Supreme Court to be a taking of private property requiring compensation, subdivision (2) is void." SDCL 41-9-1.1.

#23492

Based on the plain language as well as the background of the statute, I would conclude that the underlying intent of the statute was to expand the definition of road hunting to include shooting at birds that fly from the roadway onto private land, and that the State effectively enlarged the hunting easement to include the depth of shot over private property. The effect of the amendment takes away the property owners' right to exclude road hunters from invading their property and the airspace above it. Because of the amendment, the extent of the hunting easement is now the distance gunshot can travel from the roadway easement onto the land.

[¶110.] With this interpretation, the question then becomes whether the State's action of extending the hunting easement amounts to an unconstitutional taking without compensation. The first inquiry under a takings analysis is whether the action is a *per se* physical taking, that is, a permanent physical occupation or intrusion of property and the airspace above it. *Lingle*, ___ US at ___, 125 SCt at 2082, 2087, 161 LEd2d 876; *Causby*, 328 US at 264-65, 66 SCt at 1067-68, 90 LEd 1206 (recognizing that a property owner owns the airspace above the land and because continuous invasions of airspace "affect the use of the surface of the land itself," such invasions of airspace "are in the same category as invasions of the surface" and may also be a taking). The controlling principles governing such a *per se* physical taking were established by *Kaiser Aetna v. United States*, 444 US 164, 100 SCt 383, 62 LEd2d 332 (1979), and *Loretto*, 458 US 419, 102 SCt 3164, 73 LEd2d 868. *See Lingle*, ___ US at ___, 125 SCt at 2082, 2087, 161 LEd2d 876.

[¶111.] In *Kaiser Aetna*, the United States Supreme Court recognized that government cannot compel public access to private property without just

compensation. *Id.* at 179-80, 100 SCt at 393, 62 LEd2d 332 (holding that

government imposition of a navigational servitude on a marina created and

rendered navigable at private expense required compensation). In doing so, the

Court recognized that "the 'right to exclude,' so universally held to be a fundamental

element of the property right," is an interest which "the Government cannot take

without compensation." *Id.* at 179-80, 100 SCt at 393, 62 LEd2d 332. The Court

again acknowledged that principle in *Loretto* when it defined "[p]roperty rights in a

physical thing . . . as the rights 'to possess, use and dispose of it.'" 458 US at 435,

102 SCt at 3176, 73 LEd2d 868 (citation omitted). The Court further recognized

that "[t]he power to exclude has traditionally been considered one of the most

treasured strands in an owner's bundle of property rights." *Id.* In addition, "[a]

permanent physical occupation authorized by state law is a taking without regard

to whether the State, or instead a party authorized by the State, is the occupant."

*Id.* at 432 n9, 102 SCt at 3174 n9, 73 LEd2d 868.

[¶112.].    Likewise, a physical invasion of property may be a taking even if the

government's dominion over private property is only partial or temporary in nature.

As the Court of Appeals for the Federal Circuit has explained,

> [A] permanent occupation need not exclude the property owner
> to be compensable as a taking. *See, e.g.,* Loretto v. Teleprompter
> Manhattan CATV Corp., 458 US 419, 436-38, 102 SCt 3164, 73
> LEd2d 868 (1982) (holding that a compulsory installation of
> cables on apartment buildings pursuant to a state statute
> constituted a taking). Nor must the occupation be continuous.
> Thus, for purposes of takings analysis, "a 'permanent physical
> occupation' has occurred . . . where individuals are given a
> permanent and continuous right to pass to and fro, so that the
> real property may continuously be traversed, even though no
> particular individual is permitted to station himself
> permanently upon the premises." Nollan v. Cal. Coastal

Comm'n, 483 US 825, 831-32, 107 SCt 3141, 97 LEd2d 677 (1987).

*Ridge Line, Inc.*, 346 F3d at 1352 (considering a claim that the federal government took a flowage easement by increasing runoff on the plaintiff's property and finding that circuit court erred in requiring proof that the plaintiff's property was effectually destroyed or that it suffered a permanent and exclusive government occupation which destroyed its right to possession); *see also* United States v. Dickinson, 331 US 745, 67 SCt 1382, 91 LEd 1789 (1947) (affirming a lower court's finding that the federal government took an easement by inverse condemnation when its dam caused intermittent flooding).

[¶113.]    In this case, SDCL 41-9-1.1(2) allows the State to exercise dominion and control over Landowners' property.  Under that dominion, the State gives hunters a permanent and continuous right to invade Landowners' property during hunting season.  Just as intermittent flooding may be a taking, so may the seasonal appropriation of Landowners' property by the State in a manner which completely deprives them of their right to exclude.  The effect of SDCL 41-9-1.1(2) is to require Landowners, year after year, to submit the use of their land to the State, which appropriates the benefit of the property to the public under terms the State establishes.  Because of the statutory provision, Landowners are permanently deprived of a fundamental property right—the right to exclude.  An after-the-fact civil suit cannot suffice where the State's action "does not simply take a single 'strand' from the 'bundle' of property rights:  it chops through the bundle, taking a slice of every strand."  *Loretto*, 458 US at 435, 102 SCt at 3176, 73 LEd2d 868.

[¶114.]     Because SDCL 41-9-1.1(2) constitutes a *per se* physical taking, the regulatory takings analysis under the factors set forth in *Penn Central Transportation Co.*, 438 US 104, 98 SCt 2646, 57 LEd2d 631, does not apply.  *See Lingle*, ___ US at ___, 125 SCt at 2082, 2087, 161 LEd2d at 888, 894.  Here, the State is not "exercising its regulatory power in a manner that will cause an insubstantial devaluation of [Landowners]' property."  *Kaiser Aetna*, 444 US at 180, 100 SCt at 393, 62 LEd2d 332.  Rather, SDCL 41-9-1.1(2) imposes a servitude, which "in this context will result in an actual physical invasion of the privately owned [land]."  *Id.*  As recently reiterated by the United States Supreme Court, a permanent physical invasion, however minor the economic cost, constitutes a *per se* taking because it "eviscerates the owner's right to exclude others from entering and using her property—perhaps the most fundamental of all property interests." *Lingle*, ___ US at ___, 125 SCt at 2082, 161 LEd2d 888.  The amendment to SDCL 41-9-1.1 subjects property owners to continual invasions of their airspace and their property abutting public rights-of-way during hunting season, and it deprives them of a fundamental property interest:  the right to exclude.  The intrusion suffered by Landowners may be minimal, but that fact bears only on the appropriate amount of damages, a question of fact.  *Loretto*, 458 US at 438, 102 SCt at 3177, 73 LEd2d 868 ("Once the fact of occupation is shown . . . a court should consider the *extent* of the occupation as one relevant factor in determining the compensation due.").

[¶115.]     The straightforward legislative scheme involves expanding the definition of road hunting to include shooting a bird over private property from a public right-of-way easement.  The Legislature explicitly expanded the easement to

include private property. When it did so, it demanded that Landowners subject a portion of their property for use by the public and took away their right to exclude. Such is constitutionally prohibited without compensation. Therefore, I would affirm the circuit court's holding that SDCL 41-9-1.1(2) is an unconstitutional taking of private property without just compensation and thus void, as directed by the legislation.

[¶116.] Affirmed in part and reversed in part.

[¶117.] GILBERTSON, Chief Justice, KONENKAMP and ZINTER, Justices, and JOHNSON, Circuit Court Judge, concur on Issue 1.

[¶118.] GILBERTSON, Chief Justice, KONENKAMP, Justice and JOHNSON, Circuit Court Judge, concur on Issue 2.

[¶119.] ZINTER, Justice, concurs specially on Issue 2.

[¶120.] ZINTER, Justice, and JOHNSON, Circuit Court Judge, concur on Issue 3.

[¶121.] KONENKAMP, Justice, concurs in result on Issue 3.

[¶122.] MEIERHENRY, Justice, dissents on Issue 3.

[¶123.] JOHNSON, Circuit Court Judge, sitting for SABERS, Justice, disqualified.